**UNITED STATES of America,**
**Plaintiff,**

v.

**BETHLEHEM STEEL CORPORATION and The Youngstown Sheet and Tube Company, Defendants.**

United States District Court
S. D. New York.
Nov. 20, 1958.

See also 21 F.R.D. 568.

Victor R. Hansen, Asst. Atty. Gen.,
Robert A. Bicks, First Asst. Atty. Gen.,
Allen A. Dobey (trial counsel), Donald
F. Melchior (trial counsel), George D.
Reycraft, Jr., John T. Duffner, Attys.,
Dept. of Justice, Washington, D. C., for
the United States.

Cravath, Swaine & Moore, New York
City, Bruce Bromley (trial counsel),

John H. Morse (trial counsel), W. John Nauss, Jr., Robert D. Duke, New York City, of counsel, for defendant, Bethlehem Steel Corp.

Simpson, Thacher & Bartlett, New York City, Whitney North Seymour (trial counsel), Richard Jones, New York City, Baker, Hostetler & Patterson, Howard F. Burns, Raymond T. Jackson (trial counsel), Cleveland, Ohio, of counsel, for defendant, The Youngstown Sheet and Tube Co.

WEINFELD, District Judge.

The Government seeks to enjoin a proposed merger between the defendants, Bethlehem Steel Corporation and The Youngstown Sheet and Tube Company, on the ground that it would violate section 7 of the Clayton Act, as amended.[1]

Under the proposed merger Bethlehem is to acquire all the assets and properties of Youngstown pursuant to an agreement between them entered into on December 11, 1956. Prior to the execution of the agreement the defendants applied to the Department of Justice for clearance[2] and submitted in support of their request detailed data pertaining to themselves, to other companies in the iron and steel industry, and to the industry in general. The Department of Justice was of the opinion that the contemplated merger came within the ban of section 7 and refused clearance. When the defendants nonetheless executed the merger agreement the Government commenced this suit to block its consummation.

The Government, relying in large measure upon the data submitted by the defendants in support of their clearance application, supplemented by facts culled from governmental and steel industry reports, moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants in opposing the motion contended that the data relied upon by the Government did not give the complete factual picture necessary for a determination of the competitive consequences of the proposed merger. While most of the basic facts relevant to a decision of the ultimate issues were not in dispute, the Court was of the view that additional evidence, not in the summary judgment record, would, in view of the complex issues centering about a vast industry vital to the nation's economic welfare, be helpful in deciding the case. Accordingly, the Court, without disposing of the motion in classical summary judgment terms, decided that as a matter of sound judicial administration the case should proceed to trial in order to obtain a more comprehensive record.[3]

On its summary judgment motion the Government confined its attack to the horizontal aspects of the proposed merger. Upon the trial the Government expanded its attack and urged as an additional ground the vertical aspects of the merger.

At the trial the parties stipulated that the affidavits and exhibits submitted in support of and in opposition to the Government's motion for summary judgment be deemed part of the trial record, subject to the right of cross-examination. A number of the affiants were cross-examined at length. Other witnesses were called by the parties and testimony was given on both the horizontal and vertical aspects. The parties, at the Court's suggestion, further stipulated many additional basic facts with respect, among other matters, to capacity, production, and shipments for the iron and steel industry as a whole and for Bethlehem and Youngstown separately.

Since a good deal of the evidence was of a technical nature requiring some understanding of the process of producing steel and steel products and the opera-

---

1. 64 Stat. 1125 (1950), 15 U.S.C.A. § 18.

2. For an explanation of the Department's clearance procedure, see Hansen, The Department of Justice and the Antitrust

Laws, published in Understanding the Antitrust Laws 137, 144 (PLI 1958).

3. United States v. Bethlehem Steel Corp., D.C.S.D.N.Y.1958, 157 F.Supp. 877.

tions of steel plants, the Court with the consent of counsel and in their company, observed in operation two of the plants of one of the defendants.

The record before the Court reveals that generally there is no dispute as to the basic facts. The essential differences between the parties are as to the inferences and conclusions to be drawn from those facts and the interpretation of section 7 of the Clayton Act.

The Government's basic charge is that the proposed merger will substantially lessen competition in the iron and steel industry as a whole and in a variety of important products on a nationwide basis as well as in many areas of the country.

The defendants, while conceding they are in competition with one another in certain areas of the country with respect to certain products, deny that such competition is substantial—indeed, they urge that it is de minimis. Their essential position is not only a denial that the merger may substantially lessen competition, but on the contrary that it would have a beneficial competitive effect; that the expansion of steel capacity contemplated under the merger plan would stimulate competition both in the area of expansion and in other areas, and would enable Bethlehem to challenge the dominant position of United States Steel Corporation in the steel industry.

At the outset it is well to emphasize that the case does not involve any claim of violation or threatened violation of any provision of the Sherman Act. We are not dealing with issues of restraint of trade, monopolization or attempt to monopolize. The Government's attack on the proposed merger is grounded solely on section 7 of the Clayton Act, as amended in 1950, which provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." [4]

We turn to the legislative history of the Clayton Act, to the circumstances which gave rise to its passage and to the 1950 amendment of section 7.

It is stating a fact of history to say that Congress felt that the Sherman Act passed in 1890 [5] had proved quite ineffective in halting the growth of "trusts" and monopolies. Huge consolidations and mergers continued to be effected through the purchase of stock and "trusts" continued to flourish. The evils of corporate mergers and combines with their increasing concentration of power commanded the concerned attention of the nation. The "rule of reason" enunciated by the Supreme Court in 1911 in Standard Oil Co. v. United States,[6] regarded by many as having weakened the Sherman Act, gave impetus to efforts to secure more effective means of preserving our free enterprise system. Political agitation for curbing the growing power of "trusts" and the concentration of economic power followed the Supreme Court ruling. In the national campaign of 1912 all major political parties denounced the monopolistic trends and their platforms carried planks for remedial legislation. The

4. 64 Stat. 1125 (1950), 15 U.S.C.A. § 18.

5. For an historical summary of events which led to the passage of the Sherman Act, see United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 319, 17 S.Ct. 540, 41 L.Ed. 1007.

See also United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 386, 76 S.Ct. 994, 100 L.Ed. 1264.

6. 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

leadership in the efforts to strengthen the antitrust laws was assumed by Woodrow Wilson, who thereafter in a series of messages to Congress urged further legislative action.[7] The Congress acted in 1914 by passing the Clayton Act.[8] Its essential purpose was preventative—to check anticompetitive acts in their incipiency before they reached the dimensions of Sherman Act violations. In short, Congress contemplated a standard much less rigorous than that which had become required under the Sherman Act. As stated in the Senate Report on the bill:

"Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by [the Sherman Act], or other existing anti-trust acts, and thus, by making these practices illegal to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."[9]

This has been expressly recognized by the Supreme Court.[10]

Despite the clear purpose of the original section 7 of the Clayton Act, its objectives were not fully realized. This frustration was generally attributed to a number of factors. First, the statute applied only to acquisitions of stock and did not apply to acquisitions of assets, and even as to stock acquisitions it was interpreted so as not to apply where the stock was used to acquire assets.[11] Second, it was generally assumed that original section 7 did not apply to vertical mergers.[12] The inadequacies of the section, whatever the reasons, were further highlighted by pronounced post war merger activity which resulted in the elimination by large corporations of independent companies in industries which had traditionally been considered small business fields. Congress showed increasing concern with the sharp rise in economic concentration and with the prospect of even greater concentration in the light of the continuing merger trend.[13] Further, the Columbia Steel case [14] brought home the limitations of the Sherman Act in merger cases. It was against this background that Congress amended section 7.

The 1950 amendment to section 7 expanded its sweep so as: (1) to prohibit the acquisition of assets as well as stock; (2) to broaden the area in which competition may be adversely affected by eliminating the test of whether the effect of the acquisition may be substantially to lessen competition *between the acquiring and the acquired corporation;* (3) to eliminate the prior test of whether the acquisition might restrain commerce "in any * * * community" and instead, to make the test whether "in any line of commerce in any section of the country" the acquisition may substantially lessen competition, or tend to create a monop-

7. See, e. g., Message to Congress, January 20, 1914, 51 Cong.Rec. 1978.

8. 15 U.S.C.A. § 12 et seq. Also the Federal Trade Commission Act, 38 Stat. 717 (1914), as amended, 15 U.S.C.A. § 41 et seq.

9. S.Rep. No. 698, 63d Cong., 2d Sess. 1 (1914).

10. United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057.

11. Swift & Co. v. F. T. C., 1926, 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405; Thatcher Mfg. Co. v. F. T. C., 1926, 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405; Arrow-

Hart & Hegeman Elec. Co. v. F. T. C., 1934, 291 U.S. 587, 54 S.Ct. 532, 78 L. Ed. 1007.

12. Cf. United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057.

13. H.R.Rep. No. 1191, 81st Cong., 1st Sess. 2–3 (1949) (hereafter referred to as H.R.Rep. No. 1191); Federal Trade Commission, A Summary Report on the Merger Movement (1948).

14. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. See also H.R.Rep. No. 1191, pp. 10–11.

oly; and (4) to cover vertical as well as horizontal mergers.

The Congressional reports illuminate the reasons which led to the amendment of section 7. A fair reading of both the Senate and House Committee Reports [15] leaves no doubt as to its major objectives. As stated in those Reports they were, in some instances in haec verba, (1) to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions; (2) to meet the threat posed by the merger movement to small business fields and thereby aid in preserving small business as an important competitive factor in the American economy; (3) to cope with monopolistic tendencies in their incipiency and before they attain Sherman Act proportions; and (4) to avoid a Sherman Act test in deciding the effects of a merger.

Against the historical background of the Clayton Act and the 1950 amendment of section 7, we proceed to consider the issues.

■ In broad outline, the essential issues which the Court is called upon to determine, and as to which the Government has the burden of proof, are: the line or lines of commerce and the section or sections of the country in which the effects of the merger may be felt—in other words, the relevant market with respect to both products and geographic areas—and whether there is a reasonable probability that the merger may substantially lessen competition or tend to create a monopoly within the relevant market.

The contending positions of the parties can be understood only against the background and general pattern of the iron and steel industry, the making and distribution of steel and steel products, the nature, size and location of the companies in the industry, the nature of competition in the industry generally, and the relative positions of Bethlehem and of Youngstown. The parties are in irreconcilable dispute on what are the relevant markets both as to products and areas. The difficulty recognized by the Supreme Court "of laying down a rule as to what areas or products are competitive, one with another" [16] is highlighted in this case.

I

The Iron and Steel Industry

The iron and steel industry is one of the most important, if not the most important of all American industries. Indeed, in contemporary international terms, steel production is viewed as a basic measure of the strength and status of a country. The industry is commonly recognized as set apart and as a separate and distinct segment of American industry. Its activities extend from the mining of iron ore through the production and sale of pig iron, steel ingots and various finished steel products. It does not include the fabrication of steel by consuming industries. The fabrication of steel is carried on to a large extent by companies in other recognized segments of American industry. However, a number of companies, including the defendants, engaged primarily in the iron and steel industry, are also engaged in the fabrication of products from steel.

In 1955 [17] the iron and steel industry produced 117 million tons of steel ingots. From this raw material, it shipped to steel consumers 85 million tons of finished steel products. The net billing value of these products and other services approximated $14 billion. Total property, plant and equipment of the industry in 1955 carried a depreciated valuation of over $5.5 billion, and the total assets

15. H.R.Rep. No. 1191; S.Rep. No. 1775, 81st Cong., 2d Sess. (1950) (hereafter referred to as S.Rep. No. 1775).

16. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 511, 68 S.Ct. 1107, 1116, 92 L.Ed. 1533.

17. 1955 data is used generally in this opinion because much of the evidence centered about that year. The record contains evidence as to other years with respect to which the Court has also made findings of fact.

were carried at more than $12 billion. The industry employed about 600,000 workers who put in a total of over one billion man hours and received wages and salaries of over $3.3 billion. Stockholders numbered more than 800,000 and had an equity of almost $8 billion.

## The Process of Making Steel and Steel Products

The finished steel products sold to consuming industries by companies in the iron and steel industry have their origin in iron ore, coal and limestone. These raw materials, after preliminary processing, are combined in blast furnaces to produce molten pig iron. The iron is then combined with scrap steel in steel making furnaces, principally open hearth, to produce steel in a molten state. The molten steel is poured into moulds where it solidifies into ingots. The ingot is the first solid form in which most steel is made; it is the raw product from which all steel products except castings are made. Most ingots are not sold as such but are further processed by the steel producing company.

The initial step in the processing of ingots into finished steel products is the rolling of heated ingots. The ingot, after heating and primary forming into blooms, billets or slabs, is conveyed to rolling mills where it is further shaped into various forms. This is known as the hot rolling process and the end products are called hot rolled products. Each category of hot rolled products is produced in a separate and distinct mill and the varieties of size and shape within each category are achieved by using different rolls or making other alterations in the particular mill. The various types of hot rolling mills include plate, sheet and strip, bar, rod and structural shape mills.

The principal categories of hot rolled products are sheets, strip, bars, coils, wire rods, plates, skelp, pierced billets and structural shapes. Hot rolled sheets account for one-third of all hot rolled products. Bars represent nearly one-sixth of the total. Thus, hot rolled sheets and hot rolled bars account for about 50% of all hot rolled products.

About half of the total tonnage of hot rolled products is shipped directly to steel fabricating consumers. The balance is retained for further processing into cold rolled or other finished steel products. Sheets, strip and bars are cold rolled or finished for the purpose of reducing thickness and otherwise changing the physical characteristics. Coils are cold rolled and then covered with tin to produce tin plate. Skelp is further processed into welded pipe, while pierced billets, through a different process, are made into seamless pipe. Wire rods are drawn through a die or a series of dies into wire. Each of the cold rolling or other finishing processes is carried on in a separate and distinct mill. Cold rolled sheets are the most significant of the products derived from the hot rolled products, constituting about one-third of the total.

## The Steel Consumer

The principal consumers of finished steel products include the automotive industry, warehouses and distributors, and the construction, container, oil and gas, rail transportation, electrical machinery and equipment and appliances industries. The largest single outlet is the automotive industry which consumes approximately 25% of all steel products. Warehouses and distributors channel about 17% of steel production to various small consumers. The construction industry absorbs approximately 9%, the container industry in excess of 8%, the oil and gas industry about 7% of total steel shipments, and the balance is scattered among other consumers.

## Size, Nature and Location of Companies in the Iron and Steel Industry

The iron and steel industry is a highly concentrated one. It is an oligopoly. Twelve integrated companies control 83% of the industry capacity. In all, as of January 1, 1957, the iron and steel industry consisted of 247 companies engaged in one or more processes of mak-

ing steel products. There were 23 integrated, 61 semi-integrated, and 140 nonintegrated companies. In addition there were 12 producers of ferroalloys and 11 operators of merchant blast furnaces.

Integrated companies begin the manufacture of steel by mining the raw materials. They operate coke ovens, blast furnaces, steel making furnaces and rolling and finishing facilities. Semi-integrated companies do not operate blast furnaces which make pig iron. They purchase pig iron or steel scrap from which they manufacture steel. Nonintegrated companies purchase steel from integrated or semi-integrated companies and begin their manufacturing operations with the rolling of steel.

The 23 integrated companies own approximately 90% of the industry capacity for coke, blast furnace products, ingots and hot rolled products. The semi-integrated companies own over 9% of the industry capacity for ingots and hot rolled products. The output of these companies is measured in millions of tons. Their gigantic size becomes graphic when it is noted that 39 of these companies are included in the 500 largest American industrial companies and that 16 of the 39 are not fully integrated.

The twelve largest integrated companies and their percentage of the industry ingot capacity for 1957 are shown in the following table:

| Company | Percent of Industry Capacity |
| --- | --- |
| United States Steel Corp. | 29.7 |
| Bethlehem Steel Co. | 15.4 |
| Republic Steel Corp. | 8.3 |
| Jones & Laughlin Steel Corp. | 4.9 |
| Youngstown Sheet & Tube Co. | 4.7 |
| National Steel Corp. | 4.6 |
| Armco Steel Corp. | 4.5 |
| Inland Steel Corp. | 4.1 |
| Colorado Fuel & Iron Corp. | 2.1 |
| Wheeling Steel Corp. | 1.6 |
| Sharon Steel Corp. | 1.4 |
| Ford Motor Co. | 1.4 |

This table demonstrates the high degree of concentration in the iron and steel industry and within the class of the integrated companies. As already noted, these twelve largest integrated companies had almost 83% of the ingot capacity. The six largest had almost 68%. The two largest, United States Steel and Bethlehem, had 45.1%.

The American Iron and Steel Institute, the acknowledged industry association, divides the country into six production districts for the purpose of reporting statistics of production and capacity. Four of these districts,[18] which coincide with the highly industrialized northeast quadrant of the United States,[19] contain about 89% of the industry's total ingot capacity, produce about 90% of the nation's ingots and consume approximately 83% of the national consumption of steel.

Position of Bethlehem and Youngstown in the Iron and Steel Industry

Bethlehem is the second largest company in the iron and steel industry; Youngstown is the sixth largest.[20] Bethlehem's steel ingot capacity as of January 1, 1958 was 23 million tons, representing 16.3% [21] of the total industry capacity. Youngstown's ingot capacity

18. The Eastern, Pittsburgh-Youngstown, Cleveland-Detroit, and Chicago Production Districts of the AISI.

19. The northeast quadrant of the United States, as defined by the Court, includes the following states: Connecticut, Delaware, District of Columbia, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia and Wisconsin.

20. Youngstown's ingot capacity as of January 1, 1957 put it in fifth position for that year.

21. On January 1, 1957 Bethlehem had 15.4% of industry capacity. The increase in the percentage share is accounted for by a 2,500,000 ton expansion reported on January 1, 1958.

was 6.5 million tons, representing 4.6% of the industry total. The combined capacity of the two companies would amount to 29.5 million tons, representing 20.9% of the industry. Both companies rank among the largest corporations in the United States. In 1957 Bethlehem was the ninth, and Youngstown the fifty-third largest industrial corporation in terms of sales. Bethlehem at the end of 1957 had total assets of $2,260 million while Youngstown had total assets of $636 million.[22]

Bethlehem and Youngstown are fully integrated from the mining of iron ore through the production of pig iron, steel ingots and various finished steel products. Both companies are further integrated vertically into the manufacture and sale of oil field equipment and other fabricated products. Both operate oil field supply stores in the oil producing regions of the country. Bethlehem has carried its integration into a number of fabricating fields not occupied by Youngstown. Youngstown is a source of supply for independent fabricators who compete with Bethlehem in the sale of certain fabricated products.

Bethlehem and Youngstown both produce and sell the principal products of the iron and steel industry including coke oven byproduct chemicals, pig iron, steel ingots, strip mill plates, hot rolled bars, track spikes, sucker rods, concrete reinforcement bars, wire rods, wire, hot rolled sheets, cold rolled sheets, hot rolled strip, cold rolled strip, electrolytic tinplate, hot dipped tinplate, black plate, buttweld pipe and electricweld pipe. In addition Bethlehem produces some 35 classes of finished steel products that Youngstown does not make. Youngstown produces and sells seamless pipe, stampings and pressed steel parts which are not produced by Bethlehem. However, Bethlehem competes with Youngstown in the sale of seamless pipe which Bethlehem does not manufacture but obtains from United States Steel.

About 75% of the combined capacity of Bethlehem and Youngstown for the production of finished steel products is represented by products which both companies produce and sell in common. In 1955 the combined sales of Bethlehem and Youngstown of these common products amounted to approximately $1.5 billion.

Bethlehem's plants for the production of steel products are located at Bethlehem, Johnstown and Steelton, Pennsylvania; Sparrows Point, Maryland; Lackawanna, New York; Los Angeles and South San Francisco, California; and Seattle, Washington. Youngstown's plants are located at Youngstown, Ohio, and East Chicago, Indiana. From these plants both companies ship their products throughout the United States.

### Mergers and Acquisitions of Bethlehem and Youngstown

Much of the growth of both Bethlehem and Youngstown is attributable to mergers and acquisitions. Bethlehem was incorporated in 1904 as a consolidation of ten companies. Since its formation, it has acquired the properties of more than thirty independent companies. Its initial entry into each new steel producing location in various parts of the country has been achieved through the acquisition of other companies. Indeed, Bethlehem has never built a new steel plant in a new location. In addition to acquiring various sizeable steel companies, Bethlehem in later years has also acquired a number of small companies in the steel fabrication field.

Bethlehem, starting with an ingot capacity of 212,800 tons in 1905, has grown to an ingot capacity of 23,000,000 tons as of January 1, 1958. In 1920 Bethlehem held 6.3% of the industry ingot capacity. Following acquisitions in the 1920's Bethlehem by 1930 had reached 14.2%, and by 1958 had increased to 16.3% of the industry ingot capacity. Since its formation, 26% of the growth

---

22. In terms of assets the two companies ranked eleventh and fifty-second.

of Bethlehem has been due to acquisitions, 58% to enlargement of acquired facilities, and 16% to enlargement of Bethlehem's original facilities.

Youngstown, starting with an ingot capacity of 806,400 tons, has grown to an ingot capacity of 6,500,000 tons as of January 1, 1958. A substantial portion of this growth is attributable to mergers and acquisitions. Since 1901, 20% of the growth of Youngstown has been due to acquisitions, 52% to enlargement of acquired facilities, and 28% to enlargement of Youngstown's original facilities.

### Competition in the Iron and Steel Industry

There is no real price competition in the iron and steel industry. The record in this case establishes that United States Steel initiates the price changes for steel products and that its lead is followed by all other steel producers. With few exceptions, the mill price for each steel product does not vary significantly from company to company.

A principal form of competition in the steel industry is the assurance to buyers of continuing sources of supply. Although from the buyer's standpoint the total delivered cost is an important factor in determining from which steel company he will buy, it is not controlling. There have been recurrent periods of short supply of steel generally. Particular steel products have chronically been in short supply. An assured source of supply is extremely important; it is so important to a steel consumer that he regards a stable and continuing relationship with a supplier of greater importance than price.[23] Equally important are multiple sources of supply. The consumer, to assure himself of a continuing supply in times of scarcity, will, in times of plenty, often forego buying from a nearby steel supplier and instead deal with a more distant supplier and willingly bear the freight differential.

Another consideration influencing the buyer's choice is the desire to purchase from a steel company which does not manufacture the same products to avoid dependency on a competitor for his raw material. The buyer also takes into account the services offered by the steel supplier, such as engineering assistance and delivery schedules.

Competition in the steel industry is sometimes reflected in the absorption of freight. When steel is plentiful, steel mills tend to reach out to distant markets and, in times of shortage, they tend to fall back from distant markets. When the supply of steel exceeds the demand a steel company will absorb more freight than it would otherwise absorb in order to reach a distant market. The following is a general illustration of how freight absorption works.

Steel products are sold f. o. b. the mill. When steel or a particular steel product is in short supply the customer pays the freight cost. When steel is plentiful the steel company may absorb the freight differential so that the total delivered cost to the customer is no greater than the amount he would have to pay to a steel company located closer to his plant.

This is the general picture of competition in the steel industry. We now proceed to consider the issue of relevant market and the impact of the proposed merger in that market.

## II

### The Relevant Market

Section 7 of the Clayton Act proscribes those mergers which may substantially lessen competition or tend to create a monopoly "in any line of commerce in any section of the country". The ultimate question of whether a merger comes within the ban of section 7 requires a consideration of the relevant

---

23. Also large consumers of steel, possessed of vast financial assets, such as automobile and electrical equipment companies, have loaned substantial sums of money, as much as $25,000,000, to steel companies in order to obtain firm commitments of steel production.

market. Like other sections of our antitrust laws, section 7 does not contain the word "market". It is clear, however, that "line of commerce" signifies a product market and "section of the country" refers to a geographic market. Equating the language of section 7 to the concept of market does not, however, mean that the section 7 market is the same as the market for purposes of other sections of the antitrust laws. Nor is the section 7 market necessarily the same as the economist's concept of market. Whatever difference there may be between legal scholars and economists in their respective definition of terms used in the antitrust laws, obviously the Congressional standard is controlling upon, and serves as the guide to, the Court.

▆ The section 7 market can only be defined in the light of its overall objectives and with particular recognition that it is being defined for the purpose of determining the reasonable probability of a substantial lessening of competition and not for the purpose of determining whether monopoly power will exist as a result of the merger. As the House Committee Report states "[Section 7] is intended [to apply] when the effect of an acquisition may be a significant reduction in the vigor of competition, even though its effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize".[24]

▆ A horizontal merger can affect competition in at least two ways. It can have an impact not only on the competitors of the merged companies but also on the buyers who must rely upon the merged companies and their competitors as sources of supply.[25] The purpose of section 7 is to guard against either or both effects of a merger—if the likely consequence is substantially to lessen

competition or to tend to create a monopoly. The section 7 market must therefore be considered with reference to the two groups—(1) the competitors of the merged companies and (2) the buyers who would be dependent upon the merged companies and their competitors as sources of supply. While both impacts of a merger are interrelated and in an ultimate sense feed on each other, the major impact in some cases will be on the buyers and in other cases on the competitors of the merged companies. As the House Committee Report states:

"[The proscribed] effect may arise in various ways: [1] such as elimination in whole or in material part of the competitive activity of an enterprise which has been a substantial factor in competition, [2] increase in the relative size of the enterprise making the acquisition to such a point that its advantage over its competitors threatens to be decisive, [3] undue reduction in the number of competing enterprises, or [4] establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete." [26]

Where, as in this case, the companies proposing to merge sell numerous products from several plants which are not in the same immediate area, it is to be expected that there would be a difference of opinion on the question of relevant market. The defendants urge market delineations which the Government charges have been arbitrarily defined for the purpose of minimizing the true competitive picture and to distort the availability of each as an alternative source of supply. The Government instead advances its own markets which in turn the defendants charge exaggerate the true competitive relationship of the de-

24. H.R.Rep. No. 1191 p. 8.

25. Of course lessening of competition also may have an adverse effect on the public generally by removing the incentive to provide services and to innovate and achieve greater efficiency and output at

reduced prices through research. These matters are not directly in issue in this case except insofar as they are a danger from any substantial lessening of competition or tendency to monopoly.

26. H.R.Rep. No. 1191 p. 8.

fendants to one another and in the industry.

## Line of Commerce

The Government contends that a line of commerce is any product or group of products that has peculiar characteristics and uses, which make it distinguishable from all other products. It predicates its position upon the definition of line of commerce by the Supreme Court in the du Pont-General Motors case.[27] There the Supreme Court held that "automotive finishes and fabrics have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other finishes and fabrics to make them a 'line of commerce' within the meaning of the Clayton Act".[28]

The Government urges broad lines of commerce on an industrywide basis and also narrow lines based on individual products. The Government contends that the entire iron and steel industry is a line of commerce; that the products of the iron and steel industry in general have sufficient peculiar characteristics and uses to make them, as a totality, a separate line of commerce from the products of other industries.

It advances a similar industrywide line of commerce with respect to the manufacture and sale of oil field equipment. This group includes the separate products: drawworks, rotaries, traveling blocks, swivels, slush pumps and pumping units. So, too, it urges another line of commerce—the sale of oil field equipment and supplies by oil field supply stores—here it includes the totality of various items sold by such stores.

As noted, the Government does not confine its contentions to the broad industrywide lines of commerce. It urges that encompassed within the broad iron and steel industry line there are various steel products each of which constitutes a separate line of commerce. These additional separate lines of commerce advocated by the Government are: hot rolled sheets, cold rolled sheets, hot rolled bars, track spikes, tin plate, buttweld pipe, electricweld pipe and seamless pipe. The Government's position is that even though each of these products originates in the ingot and some of these products are made in mills which are capable of turning out other products, each is a separate line of commerce because each is physically distinct from the other, is used for different purposes, has different prices and markets, and is recognized as a different product by practice, understanding and usage in the trade.

The defendants reject all the lines of commerce advanced by the Government. While they do not deny that a number of these products have peculiar characteristics and uses, they challenge the standard of peculiar characteristics and uses as appropriate for determining the lines of commerce in the steel industry and for assessing the competitive consequences of the merger. Their position is that lines of commerce must be defined with primary emphasis on the process of producing steel products and also with emphasis on the availability of substitute products. They refer to (1) the production flexibility concept and (2) the substitute products concept. The former relates to the capacity of a steel producer to shift from product to product; the latter to competition offered by substitute products.

The defendants' position in large measure is based upon an imbalance between ingot capacity and productive capacity of finishing mills. They argue that since the larger integrated steel companies have greater capacity for production of finished steel products than capacity to produce ingots, each company has the ability to allocate its ingots among its various finishing facilities in response to changes in demand for finished products. Since the availability of ingots limits the ultimate output of finished products, the defendants would regard ingots as

27. United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057.

28. 353 U.S. at pages 593–594, 77 S.Ct. at page 877.

# 590

the basic line of commerce because ingot capacity best reflects the competitive potential of each company; however, they do not urge it because ingots are not ordinarily sold as such. Instead, since the ingot is further processed into finished steel products, the defendants contend that the finished steel products produced by both Bethlehem and Youngstown—"common finished steel products" [29]—constitute a line of commerce. They urge that this is the appropriate line of commerce because it comprises the products that are actually sold by both companies and takes into account the ability of each to allocate ingots among such products.

In addition to the broad line of commerce of "common finished steel products" the defendants urge several narrower lines of commerce which they have denominated as mill product lines. As defined by the defendants, a mill product line is a "complex of all the end products that can properly be produced on one of the industry's basic types of finishing mill—either without any alteration in the mill or with only relatively minor alterations, in, or additions to, it". They say that a producer who has such a mill can, at will, and with little extra expense, shift from one product to another and therefore the competitive potential of a steel producer should be considered in terms of the entire range of products that can be produced upon any basic type of mill. The essence of their position here is that the totality of all products rolled, or which can be rolled, in a particular type of mill should be treated as a single line of commerce. Thus if a score of products are, or can be, rolled in a particular type of mill they, in sum, constitute a single line of commerce even though they have completely different end uses.

Consequently, the defendants reject, under their mill product line theory, the Government's selection of hot rolled bars and track spikes as separate lines of commerce on the ground that a steel company with a basic bar mill can, with relatively small capital cost, produce not only hot rolled bars, but also track spikes (by adding a track spike machine to the bar mill) and other products (by minor alterations in or additions to the bar mill).

The defendants make a similar mill product line argument with respect to hot rolled sheets and cold rolled sheets each of which is advanced by the Government as a separate line of commerce. They contend that since they, and most steel companies with facilities for producing hot rolled sheets, also have facilities for producing cold rolled sheets, both should be included in one line of commerce—sheets and strip—encompassing all the products which have their origin in the basic sheet mill.

The defendants, however, do not take the same position with respect to buttweld, seamless and electricweld pipe, each of which is produced in a different type mill and each of which is advocated by the Government as a separate line of commerce. Here the defendants depart from their concept of production flexibility.[30] With respect to buttweld, elec-

---

29. "Common finished steel products" as defined by the defendants are the following categories of products which, with some minor exceptions, are produced and sold by both defendants: (1) *sheets and strip*, including hot rolled sheets, galvanized sheets, cold rolled sheets and hot and cold rolled strip; (2) *bar mill products*, including merchant bars, bar size shapes, cold finished bars, sucker rods and track spikes, but excluding concrete reinforcement bars, produced by both Bethlehem and Youngstown; (3) *tin mill products*, including electrolytic tin plate, hot-dipped tin plate, hot-dipped terne plate and black plate; (4) *rod mill products*, including wire rods, wire (both plain and coated), nails and staples, barbed and twisted wire, woven wire fence, and bale ties; (5) *plates*, including universal and sheared plate mill plates and strip mill plates; and (6) *buttweld pipe*.

30. Originally the defendants agreed with the Government that buttweld pipe was a line of commerce but upon the trial they were permitted to withdraw a stipulation to this effect.

tricweld and seamless pipe the defendants argue that although each is produced in a different type of mill so that there is no flexibility at the finishing mill stage, they should, nevertheless, all be considered only one line of commerce on the ground that to a substantial extent each type of pipe can be and is used for the same purposes. In addition the defendants argue that non-ferrous metal pipe and plastic pipe are reasonably interchangeable with steel pipe and are competitive substitutes for some uses so that they too should be included within "pipe" as a single line of commerce.

Analogously, the defendants urge that new and used oil field equipment are reasonably interchangeable and the line of commerce should embrace both. It is argued that the Government by ignoring used oil field equipment has failed to define properly this line of commerce.

Accordingly, the defendants contend that each of the following constitutes a separate line of commerce: sheets and strip, bar mill products, tin mill products, pipe, and new and used oil field equipment. Thus the Government and the defendants each advocate first, broad lines of commerce and then, separate lines of commerce of certain of the products included within the comprehensive lines of commerce.

At this point a recapitulation of the lines of commerce with respect to steel products [31] as advocated by the parties may be helpful to the ensuing discussion.

| Government's Line of Commerce | Defendants' Line of Commerce |
|---|---|
| Broad Line | Broad Line |
| *Iron and steel industry* | *Common finished steel products* |
| Separate Lines | Separate Lines |
| 1. Hot rolled sheets.<br>2. Cold rolled sheets. | (1) *sheet and strip mill products,* including hot rolled sheets, cold rolled sheets, galvanized sheets and hot and cold rolled strip |
| 3. Hot rolled bars.<br>4. Track spikes. | (2) *bar mill products,* including merchant bars, hot rolled bars, bar size shapes, track spikes, cold finished bars and sucker rods |
| 5. Tin plate. | (3) *tin mill products,* including electrolytic and hot dipped tin plate, hot dipped terne plate and black plate |
| 6. Buttweld pipe.<br>7. Electricweld pipe.<br>8. Seamless pipe. | (4) *pipe,* including buttweld pipe, electricweld pipe, seamless pipe, non-ferrous metal and plastic pipe |

31. Oil field equipment and supplies are treated separately.

The definition of line of commerce in a section 7 case is formulated for the purpose of determining the impact of a merger on competition. Competition is not just rivalry among sellers. It is rivalry for the custom of buyers. Also in many instances, and particularly in the steel industry, it is, during periods of shortage, strongly present as rivalry among buyers for sources of supply. Thus competitive forces may move in a number of directions—buyer against buyer; seller against seller; buyer against seller. But however competition is defined and whatever its form or intensity, it always involves interplay among and between both buyers and sellers. Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.

The evidence establishes that the defendants' production flexibility or mill product line theory is indeed pure theory. In practice steel producers have not been quick to shift from product to product in response to demand. Moreover, the evidence establishes that the continuing relationships between buyers and sellers in the steel industry make such shifts unlikely.[32] The inappropriateness of the defendants' production flexibility or mill product line theory is further exposed by the inconsistent positions they have themselves taken.[33]

The Court is persuaded that the Government's position for determining lines of commerce by the peculiar characteristics and uses standard is sound and should be adopted.[34]

Hot rolled sheets, cold rolled sheets, hot rolled bars, track spikes, tin plate,

32. Cf. Matter of Crown Zellerbach Corp., F.T.C.Do. No. 6180 (Dec. 26, 1957).

33. Apart from their shift in emphasis from production flexibility to reasonable interchangeability in end use, the defendants have been inconsistent with respect to their production flexibility concept itself. Their position with respect to tin plate illustrates this inconsistency. Tin plate has its origin in the basic hot rolled sheet mill. It is a hot rolled sheet which has been cold rolled to a fine gauge and coated with tin. The defendants have offered no explanation for not including this product within "sheets and strip" although they maintain that coated wire (this is a wire rod which has been cold drawn into wire and coated) is included in "rod mill products." See note 29 supra.

34. The defendants seek to distinguish the du Pont-General Motors case, United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057, and its peculiar characteristics and uses standard for defining line of commerce on the ground that there was no evidence of production flexibility in that case. In addition the defendants point to the Columbia Steel case, United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, contending that the Supreme Court there "clearly recognized that in the steel industry the nature of production processes necessarily shapes the contours of the product market".

In Columbia Steel the Government attacked under § 1 of the Sherman Act the acquisition of the Consolidated Steel Co. by United States Steel. One of the grounds of attack was that the acquisition was a forward vertical integration by United States Steel insofar as Consolidated was a customer for steel plates and structural shapes produced and sold by United States Steel and other steel companies. In analyzing this part of the case the Court assumed on the basis of an admittedly inconclusive record that all producers of plates and structural shapes could produce other rolled steel products interchangeably with plates and structural shapes and therefore the elimination of Consolidated's demand for plates and structural shapes should be measured "not against the market for plates and shapes alone, but for all comparable rolled products". This suggests a definition of product market on the basis of production flexibility. However, the previous caveat that the standard for determining product market differs according to the different sections of the antitrust laws is here applicable. It does not follow that the production flexibility recognized in a vertical integration case under § 1 of the Sherman Act, like Columbia Steel, is controlling in a horizontal case under § 7 of the Clayton Act. While the steel producers may be able to shift their production from one product to another, the buyers obviously cannot so shift their purchases. A user of steel sheets cannot make do with bars,

buttweld pipe, electricweld pipe, seamless pipe, oil field equipment and oil field equipment and supplies, each has unique physical characteristics, is distinct one from another, has different end uses, and is recognized by steel producers and consumers as a distinct product. Each has its own competitive standards and markets. Finally, there are no effective substitutes for any of them.[35] Since there are no effective substitutes which compete with the various lines of commerce as found by the Court, it is not necessary to discuss the defendants' contention that the reasonable interchangeability test of the Cellophane case [36] is applicable here. The only other line of commerce which requires consideration is the iron and steel industry.

The products of the iron and steel industry as a group are generally standardized, are not subject to the va-

---

rods, pipe or plates. The only flexibility the buyer has is in the choice of the company from which he buys the product he needs. It is just such freedom of choice that § 7 is designed to protect and for that reason line of commerce must take into account buyers and uses.

Further, the vitality of the Columbia Steel case has been questioned in the light of the passage of amended § 7. Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 741.

35. *Hot rolled sheets* are substantially less expensive than *cold rolled sheets* which are better suited to the application of a good paint finish. Hot and cold rolled sheets are substantially less expensive than aluminum and copper sheets and for their predominant uses cannot be economically replaced by other products. The parties have stipulated that hot and cold rolled sheets have peculiar characteristics and uses.

*Hot rolled bars* is a grouping of products such as alloy bars, carbon bars and special quality bars produced in a great variety of sizes and shapes each of which has different physical characteristics, uses and customers one from another. The parties have stipulated that: "Hot rolled bars have physical characteristics and end uses generally different from the products of finishing mills other than bar mills."

*Track spikes* are a fabricated product used to hold rail and tie plates in place on railroad ties. The parties have stipulated that track spikes have peculiar characteristics and uses that distinguish them from all other steel products.

*Tin plate*, electrolytic and hot dipped, is the principal component of a group of products referred to as tin mill products which the defendants acknowledge as a line of commerce.

*Buttweld pipe, electricweld pipe* and *seamless pipe* have differing physical properties and very different pressure resisting qualities. There are significant price differentials on a per foot basis. The predominant use of buttweld pipe is for plumbing and heating in homes, factories and office buildings and for structural purposes. The predominant use of electricweld pipe is for pipe lines. The predominant use of seamless pipe is in the drilling for, and extraction of, oil. There are no effective substitutes for the predominant uses of any of the types of steel pipe.

*Oil field equipment* and *oil field equipment and supplies* are groupings of products used by the oil producing industry for drilling and operating oil wells and transporting oil on the surface. In the case of oil field equipment the record is not clear as to the existence of reasonably interchangeable substitutes. The parties have stipulated that: "An important factor in the oil field equipment business is the large trade in used items of oil field equipment; manufacturers of such equipment continue to produce spare parts for equipment that has been in operation up to 20 years and well-equipped machine shops are in a position to restore and extend almost indefinitely the useful life of such equipment". But whether the trading in the used items encompassed in this stipulation is with respect to complete units or for only replacement parts, the Court regards new oil field equipment as a separate line of commerce from used oil field equipment. See note 36 infra. Cf. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416.

Separate detailed findings of fact have been made with respect to all the above products.

36. United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. It should be noted that the basic issue in the Cellophane case was that of monopoly power and the Supreme Court expressly limited the market definition there to the monopolization clause of § 2 of the Sherman Act. There is a basic distinction

594

garies of style appeal, and have peculiar characteristics and uses for which there are no effective substitutes. The manufacture of such products requires special know-how and experience, huge capital investment and a trained labor force. The products of the iron and steel industry are generally distinct one from the other and as a group distinct from the products of other industries. They are sold in a recognized market with its own competitive standards. The iron and steel industry is commonly recognized by its members as well as the community at large as a separate industry. It has its own trade association, treating the industry as separate and distinct. In the light of these facts the conclusion is warranted that the sum of all the products of the iron and steel industry constitute a line of commerce. Since Bethlehem and Youngstown both produce and sell the principal products of the iron and steel industry, it is an appropriate line of commerce for analyzing the effect of this merger.

With respect to the iron and steel industry, four sets of statistics serve as guides in considering the impact of the proposed merger on competition— (1) blast furnace capacity and production, (2) ingot capacity and production, (3) shipments of all finished steel products and (4) shipments of "common finished steel products". Ingot capacity is the basic measure of size and rank in the iron and steel industry and reflects productive potential for the various items which make up the finished steel products which are sold in commerce. "Common finished steel products" is a valid guide on two grounds—(1) on a tonnage basis it represents over 75% of all steel products and (2) it includes virtually all the products that both Bethlehem and Youngstown produce in common. It may be well to note that all four guides as a practical matter coincide with or reflect virtually the same percentages as the defendants' "common finished steel products" line of commerce.[37] As a matter of statistical con-

between § 2 of the Sherman Act and § 7 of the Clayton Act. Further, monopoly power was defined by the Supreme Court in the Cellophane case as "the power to control prices or exclude competition". Obviously, when the question is power over price, substitute products may be relevant because they can limit that power. The issue under § 7 of the Clayton Act is not whether a merger may result in a company having power over price or the power to exclude competition. The issue under § 7 is whether there is a reasonable probability of substantial lessening of competition. There can be a substantial lessening of competition with respect to a product whether or not there are reasonably interchangeable substitutes. The

merger of two producers of a product may substantially lessen competition or tend to create a monopoly in the market for that product even though it does not substantially lessen competition or tend to create a monopoly in the broader market embracing all the products which are reasonably interchangeable with that product. But cf. Matter of Brillo Mfg. Co., F.T.C.Do. No. 6557 (May 23, 1958). This does not, however, mean that interchangeability can be ignored— a high degree of interchangeability may under certain circumstances make it more or less the same product. American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y.1957, 152 F. Supp. 387, affirmed, 2 Cir., 1958, 259 F.2d 524.

37. The following table for 1955 on a nationwide basis is illustrative:

| | Blast Furnace | | Ingot | | Shipments all finished steel products | Shipments common finished steel products |
| | Capacity | Production | Capacity | Production | | |
|---|---|---|---|---|---|---|
| Bethlehem | 14.8% | 15.3% | 15.4% | 16.1% | 14.3% | 14.4% |
| Youngstown | 4.8% | 5.2% | 4.7% | 4.8% | 4.8% | 4.9% |

venience, shares of industry shipments of steel products, where such shares are considered on the questions of geographic markets and impact on competition with respect to the iron and steel industry line of commerce, will hereafter be stated primarily in terms of "common finished steel products".

In terms of end result there is in fact no significant difference whether the iron and steel industry, the broadest line advocated by the Government, or "common finished steel products," the broadest line advocated by the defendants, is accepted as the appropriate line of commerce for considering the competitive consequences of this merger.[38] With regard to either line, the Government's iron and steel industry, or the defendants' "common finished steel products," the proportionate share of each defendant's industry shipments and production remains virtually the same.

Upon all the evidence the Court finds that the following are the appropriate lines of commerce: (1) the iron and steel industry as a whole; (2) hot rolled sheets; (3) cold rolled sheets; (4) hot rolled bars; (5) track spikes; (6) tin plate; (7) buttweld pipe; (8) electric-weld pipe; (9) seamless pipe; (10) oil field equipment and (11) oil field equipment and supplies.

It is not necessary to analyze separately and in detail each line of commerce as found by the Court, since a merger violates section 7 if the proscribed effect occurs in any line of commerce "whether or not that line of commerce is a large part of the business of any of the corporations involved"[39] or "where the specified effect may appear on [an] * * * industry-wide scale. The purpose of [section 7] is to protect competition in each line of commerce in each section of the country."[40]

Having found the lines of commerce, the next issue to be considered is the relevant section or sections of the country for each line.

### Section of the Country

The parties also differ on the appropriate relevant sections of the country for appraising the effects of the merger on competition. However they appear to agree with the view expressed by the Senate Committee that "section of the country" is not capable of rigid definition and that in application a section of the country will vary according to the particular facts of each case. The Senate Committee Report states:

"Although it is, of course, impossible to define rigidly what constitutes a 'section of the country', certain broad standards reflecting the general intent of Congress can be set forth to guide the Commission and the courts in their interpretation.

"What constitutes a section will vary with the nature of the product. Owing to the differences in the size and character of markets, it would be meaningless, from an economic point of view, to attempt to apply for all products a uniform definition of section, whether such a definition were based upon miles, population,

---

38. The defendants' insistence on the "common finished steel products" line of commerce is inconsistent with their overall position in this case. The defendants argue that in assessing the impact of the merger certain increases in competition in heavy plates and structural shapes which they allege will result from the merger should be balanced against the elimination of competition in other products. Logically then, the defendants should be urging a line of commerce at the very least broad enough to encompass plates and structural shapes for otherwise their position flies in the face of the rule that "any line of commerce" is "comprehensive and means that if the forbidden effect or tendency is produced in *one* out of *all* the various lines of commerce the words 'in *any* line of commerce' literally are satisfied". United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 594–595. note 13, 77 S.Ct. 872, 878, 1 L.Ed.2d 1057; Van Camp & Sons Co. v. American Can Co., 1929, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311.

39. S.Rep. No. 1775 p. 5.

40. H.R.Rep. No. 1191 p. 8.

income, or any other unit of measurement. A section which would be economically significant for a heavy, durable product, such as large machine tools, might well be meaningless for a light product, such as milk.

■ "As the Supreme Court stated in Standard Oil Co. v. U. S. (337 U.S. 293 [69 S.Ct. 1051, 93 L.Ed. 1371]), 'Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition.'

"In determining the area of effective competition for a given product, it will be necessary to decide what comprises an appreciable segment of the market. An appreciable segment of the market may not only be a segment which covers an appreciable segment of the trade, but it may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country.

"It should be noted that although the section of the country in which there may be a lessening of competition will normally be one in which the acquired company or the acquiring company may do business, the bill is broad enough to cope with a substantial lessening of competition in any other section of the country as well." [41]

The Government's basic position is that for the iron and steel industry as a whole and for the various component lines of commerce included therein the appropriate geographic market is the nation as a whole. In addition it proposes several alternative sections, from the single states of Michigan and Ohio to several groupings of states, the largest of which coincides with the northeast quadrant of the United States. These separate areas which the Government proposes as alternatives to the nation as a whole are predicated on the fact that they are areas into which Bethlehem and Youngstown each ships substantial percentages of its total shipments and are the areas which are the most substantial and significant consuming centers for the industry as a whole —appreciable segments of the market.

The defendants reject all the sections of the country advanced by the Government. They divide the country into three parts, Eastern, Mid-Continent and Western which they urge as the relevant sections of the country. The defendants' basic position is that the geographic market is the area in which a company is an "effective competitor" [42] in the sense of being a strong factor in competition. Based on this definition of geographic market the defendants maintain that there is not a nationwide market for steel products and for the same reasons they challenge the Government's alternative sections.[43] They urge that the location of their plants and the location of the plants of other steel com-

---

41. S.Rep. No. 1775 pp. 5–6.

42. The defendants equate the phrase "area of effective competition" appearing in the Senate Committee Report on § 7 and in United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057, and Standard Oil Co. v. United States, 1949, 337 U.S. 293, 299–300 note 5, 69 S.Ct. 1051, 93 L.Ed. 1371, with that geographic area in which each merging company is an "effective competitor" in the sense of being a strong factor in competition. While it appears that in each of the aforementioned authorities the phrase was not used in the precise sense contended for

by the defendants but rather in the sense of a portion of a market large enough to be economically significant and analyzed separately from the balance of the market, the Court has assumed arguendo that the defendants are correct in their interpretation.

43. Except for seamless pipe, electricweld pipe, oil field equipment, and oil field equipment and supplies as to which the defendants concede that the relevant section of the country is the oil producing areas or that the geographic market is nationwide. As to track spikes the parties have stipulated that the principal market is the railroad industry.

panies, particularly in the area of Pittsburgh, Pennsylvania, which is east of Youngstown's plants and west of Bethlehem's eastern plants, together with the high cost of transporting steel products, results in the two companies operating in separate markets. Thus the defendants have drawn a line north and south along the western border of Pennsylvania and north and south through the Rockies and advanced a tri-partite division of the country into the Eastern, Mid-Continent and Western Areas as reflecting the geographic markets for the purposes of this case. The effect of the defendants' tri-partite division is that the productive capacity of each defendant is separated from the other—that in no section do both companies have steel producing capacity. Thus all the Bethlehem plants are confined to the Eastern and Western Areas and all of Youngstown's to the Mid-Continent Area.

The substance of the defendants' argument is: that within each of the three areas there are natural or regional markets adjacent to the locations of the steel plants; that steel consumers prefer to purchase from steel plants which are located nearby in order to avoid excess freight charges; that steel producers prefer customers located nearby in order to reduce freight absorption when that is necessary; that the greater the distance between the customer and the steel plant, the less effective is the steel plant in the competition for the customer's business; that the competitive force of a steel plant's shipments decreases as sales are made further away from the so-called natural market. Accordingly the defendants maintain that Bethlehem is an "effective competitor" only in the Eastern and Western Areas where its plants are located and that Youngstown is an "effective competitor" only in the Mid-Continent Area where its plants are located. Conversely they classify themselves as marginal suppliers in those areas where they do not have plants and contend that their competitive positions in their non-plant areas are minor and subordinate to steel producers with plants located there.

Assuming arguendo that the defendants' standard for determining sections of the country is proper, although this is disputed by the Government, the facts do not support their tri-partite division of the country. In 1955 Bethlehem shipped into the Mid-Continent Area 2,034,-783 tons of "common finished steel products," or 4.9% of total industry shipments. Youngstown in the same year shipped into that area 2,823,992 tons or 6.7% of total industry shipments. Youngstown's total capacity is within the Mid-Continent Area. Bethlehem is without capacity there. Bethlehem's shipments of more than 2 million tons into the area demonstrate beyond challenge that in fact it is an "effective competitor" in that area. Although Bethlehem is without capacity there, the 2 million ton *shipment* of "common finished steel products" exceeded the *ingot capacity* of such large steel companies as Granite City, McLouth, Ford, Detroit, Laclede, Northwestern and International Harvester whose plants are located in the Mid-Continent Area. Two million tons is greater than the ingot capacity of 74 of the 84 companies with ingot capacity on January 1, 1957. The 2 million tons of Bethlehem shipments to the Mid-Continent Area had a value of approximately $260,000,000. Its shipments of "common finished steel products" into that area have been steady and persistent. Over a period of years Bethlehem has accounted for from 3.4% to 4.9% of total industry shipments of "common finished steel products", representing very substantial tonnages, to the Mid-Continent Area. These tonnages ranged from 1,025,410 to 2,034,783 tons. In addition, Bethlehem, over a period of years, has shipped substantial tonnages of "non-common" products to that area; in 1955 these shipments amounted to approximately 700,000 tons.

The picture is even clearer in the two states of Michigan and Ohio, which in 1955 received almost 50% of the total

industry shipments of "common finished steel products" made to the Mid-Continent Area and over 30% of nationwide shipments of such products. The industry total of these shipments to Ohio and Michigan was 19,930,000 tons. Bethlehem alone accounted for 1,805,893 tons representing 9.1%, and Youngstown accounted for 1,142,617 tons representing 5.7% of the total industry shipments. Thus Bethlehem's shipments of common finished steel products there exceeded those of Youngstown by almost 700,000 tons. The conclusion is compelled that in the two most important steel consuming states in the Mid-Continent Area, as well as in the nation as a whole, Bethlehem was a very substantial and important competitor.

Into the State of Ohio, where half of Youngstown's over 6 million tons of ingot capacity is located, Bethlehem shipped 436,679 tons while Youngstown shipped 782,616 tons, or 5.2% and 9.4% respectively of total industry shipments of 8,326,000 tons of "common finished steel products". Here, too, it is not open to serious question that Bethlehem was an "effective competitor".

Into the State of Michigan, where neither Bethlehem nor Youngstown has a plant, they shipped 1,369,214 tons and 360,001 tons respectively, representing 11.8% and 3.1% of total industry shipments of 11,604,000 tons of "common finished steel products". The Lackawanna, New York plant of Bethlehem, which the defendants place in their Eastern Area, has an ingot capacity of 5,720,000 tons, is the third largest steel plant in the nation, and represents about one-fourth of Bethlehem's total ingot capacity. Significantly, about 50% of this plant's shipments goes into the Mid-Continent Area, principally into the State of Michigan. The substantial shipments by Bethlehem into Michigan, the largest steel consuming state in the nation, forced the defendants' own witnesses at the trial to concede that Bethlehem is an "effective competitor" in Michigan and that Michigan is an area

of effective competition for the principal products of the iron and steel industry.

The defendants seek to mitigate the force of their shipments into Michigan and other areas distant from their plants by contending that such shipments are unique because they are made to so-called deficit areas. However, the imbalance between local supply and local demand is a normal condition of this industry. The sites of many of the nation's steel mills were originally selected with primary emphasis on sources of raw materials. In large measure this explains the concentration of one-sixth of the nation's capacity in the Pittsburgh area. While steel consumers originally tended to locate their plants close to the steel plants, industrial growth and development in other areas, over a period of years, have resulted in an imbalance between local supply and local demand. Thus the Pittsburgh mills produce far more than the local demand and must seek an outlet elsewhere. The same is true of Bethlehem's Lackawanna, New York plant. On the other hand the mills in the Detroit area are unable to satisfy the heavy demand of the automobile and other industries located there. Steel flows to the Detroit area from all producers. So, too, in other areas where there is greater local demand than local supply the gap is met by distant suppliers. Thus only when the iron and steel industry is viewed microcosmically does one find natural markets. These disappear when the macrocosmic view is taken.

The imbalance between local supply and local demand makes freight costs only a marginal factor. The steel companies in order to keep their plants at as close to capacity as costs dictate must ship into shortage areas, and freight costs and absorption are simply incidents of doing business. So, too, is the freight burden an incident of the steel consumer doing business when his demands cannot be met by local supply, or when to assure himself of continuing sources of supply or multiple sources of supply, he

disregards freight rates to deal with a distant steel company.

■ Many theoretical concepts were advanced to support the defendants' claim that neither is an "effective competitor" of the other and that as to each submarket that may exist in the Mid-Continent Area, Bethlehem is a relatively minor factor; that as to each submarket that may exist in the Eastern and Western Areas, Youngstown is a relatively minor factor. But these theoretical concepts must yield to the facts which have persisted in this industry through the years and reflect an industry pattern. A producer of steel has sold, and a purchaser has bought, its products far removed from the mill. Each defendant has shipped substantial tonnages of steel, representing substantial percentages of total industry shipments, to steel consuming centers far removed from its plants. Thus the obstacles claimed by the defendants, whether they be called natural barriers, freight barriers, or whatever the burden, have been successfully hurdled. In times of shortage the consumer has absorbed the freight. In times of plenty, although not always, the steel producer has carried the load. But whoever has borne the burden, the fact remains that shipments by these defendants have gone much beyond their so-called natural or regional markets.

The persistent and substantial shipments by Bethlehem indicate that it does overcome freight barriers and competes effectively with Youngstown and the other steel companies whose plants are located in the Mid-Continent Area. The fact that some other steel companies may be more favorably located in relation to consuming centers in the Mid-Continent Area does not establish that Bethlehem is not an "effective competitor". At most it suggests that the more favorably located companies may make more

profit on their sales than Bethlehem makes on its sales. But even that may be influenced by Bethlehem's ability to maintain its more distant plants at closer to full capacity.[44] The defendants' tri-partite division of the country is an obvious gerrymandering of the country to meet the exigencies of this case. Neither the industry nor any industry publication has ever recognized this empiric division. The substantial shipments, over a long period of time by Bethlehem into the Mid-Continent Area, representing substantial shares of the total industry shipments, compel rejection of its claim that it is not an "effective competitor" in that area.

■ The defendants have also overlooked several other very significant matters which must be taken into account in defining section of the country for purposes of section 7. As noted previously, section 7 is intended to protect buyers as well as competing sellers. Therefore, section of the country must be determined with respect to both buyers and sellers. The determination must be made on the basis of not only where the companies have in the past made sales, but also on the basis of where potentially they could make sales and where buyers could reasonably turn to them as alternative substantial sources of supply. Thus the Senate Committee Report on section 7 states:

> "It should be noted that although the section of the country in which there may be a lessening of competition will normally be one in which the acquired company or the acquiring company may do business, [§ 7] *is broad enough to cope with a substantial lessening of competition in any other section of the country as well.*"[45] (Emphasis supplied.)

In addition, the geographic market for the purposes of determining the impact of a merger can include all areas

---

44. A principal executive officer of Bethlehem testified that continuous operation of a steel mill reduces the cost factor and increases efficiency of operation.

45. S.Rep. No. 1775 p. 6.

where the trade in a product is affected by, and is not independent of, the trade in that product in other areas [46]—for example, if a change in price in one area has an effect on price in another area both areas may be included in one geographic market. Further, it must be remembered that amended section 7 is not focused solely on the amount of competition between the two companies which is eliminated by a merger. Its scope is much broader; it is aimed at any substantial lessening of competition or tendency to monopoly which may follow in the wake of a merger. Necessarily to be considered is the situation that will exist after a merger. Even in a case where two companies operate primarily in separate areas, a merger can have an adverse effect on competition in that the enhanced strength of the merged company may give it such an undue advantage in each area that competition may be substantially lessened. In fact the defendants in this case argue that it is by virtue of its size and presence in all areas that United States Steel exercises price leadership in the steel industry.

Application of these criteria to the facts of this case lead to the conclusion that the proposed merger may be analyzed against the nationwide market for steel, as well as against the smaller geographic areas where the impact may be felt. While it is true that to some extent there are regional markets for steel products, all these regional markets are so interrelated that what happens in one has a direct effect in the others and none is so separate that the buyers and sellers are not concerned with prices and supply and demand in the others.[47] Also, it is clear that the boundaries of these regional markets are not constant but vary from product to product and periodically with recurrent shortages and surpluses of steel products. The defendants concede that the price of a steel product at any one mill has an effect on the prices for that product charged by mills in other areas. It was testified by one of the defendants' witnesses that Bethlehem could exercise a substantial influence on prices throughout the United States. A mill cannot set a price in its local area that is greater than the price at a more distant mill plus freight from that mill to the local area. Consequently the distant mill acts as a ceiling or control on the price which the local mill may impose upon the local consumer. One instance is Bethlehem's Sparrows Point, Maryland plant which makes substantial shipments to California. It is an important factor in, and exercises substantial influence on, competition there. In fact, as to some products the Sparrows Point price controls the price in California.

Bethlehem and Youngstown are each doing business throughout the nation. Each maintains sales offices throughout the United States. Both companies have offices for the sale of products of the iron and steel industry in at least 24 of the same large cities scattered across the nation. In some of their interoffice correspondence Bethlehem and Youngstown recognize each other as competitors in the sale of various finished steel products.

---

46. Compare S.Rep. No. 1775 p. 6 "[Section of the country] may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country."

47. In connection with their argument that the merger will stimulate competition the defendants make this very point. They say: "The rapid and sizeable expansion of capacity in the Chicago area also would create additional competitive pressures in other areas and in other products as well. Supplies now coming into the Chicago area from a distance would be forced into markets closer to home, or ingots now tied up in those particular products would be freed for use in other products. In short, the effect of this merger would be a direct and substantial increase in competition in the Chicago area, and an indirect yet still substantial increase in competition in other important areas." Defendants' Brief, p. 5.

Bethlehem and Youngstown both ship some products in substantial quantities, representing substantial shares of total industry shipments, throughout the United States. One example of many will suffice. In the case of buttweld pipe, in 1955, Youngstown shipped to every single state in the Union and Bethlehem to 42 states, and for 7 of the nation's 10 largest consuming states Bethlehem and Youngstown together accounted for more than 20% of total industry shipments. A portion of the products derived from the ingots which both Youngstown and Bethlehem produce goes substantially throughout the whole United States. Each company is potentially, at least, in a position at any time to allocate an additional portion of its ingot capacity to products which it sells substantially throughout the whole United States and therefore is in a position to compete with the other to the full extent of its capacity.

Finally, and perhaps the most significant of all the factors favoring a choice of a nationwide market in this case, is the fact that throughout the nation both Bethlehem and Youngstown are substantial alternative sources of supply for buyers accounting for a substantial share of the total demand for steel products.

Of course, the national market for a product like steel is not the national market which exists for a product like cigarettes. The highly industrialized states naturally consume very much more steel than the predominantly agricultural states. Thus, the four states of Michigan, Ohio, New York and Pennsylvania receive almost 50% of total industry shipments of "common finished steel products". It is in these four contiguous states and the surrounding area running from Missouri on the west to the Atlantic, comprising the northeast quadrant of the United States, that the market for steel is concentrated. The center of this market is the Detroit area which is served by all the steel plants in a wide arc from Chicago on the west to Spar-

rows Point on the east. Within this market, consisting of a cluster of 21 states and the District of Columbia, is located 88.5% of the nation's ingot capacity; it produces 89.5% of the nation's ingots and it consumes 83.3% of nationwide shipments of "common finished steel products". It is the destination for 85.6% of Bethlehem's and 93.8% of Youngstown's shipments of those products. But while the heart of the nation's market for steel is the northeast quadrant there is no reason for separating from it the remaining 27 states which consume but 17% of national consumption and which are affected directly by the competitive situation in the northeast quadrant; particularly since 25 of these 27 states receive but fractional shares, less than 1%, of total industry shipments. The competitive standards in all other consuming centers are so dependent on, and influenced by, what happens in the dominant northeast quadrant that they should be analyzed together.

In addition to the finding that the nation as a whole is an appropriate section of the country in which to assess the anticompetitive effects of the merger, the evidence justifies further findings that there are separate sections of the country—appreciable segments of the market—with respect to the iron and steel industry and the other lines of commerce found by the Court, where the impact will also manifest itself.

Obviously, the northeast quadrant with about 90% of capacity and production and 83% of national consumption is also a section of the country in which to test the effect of the merger. With the exception of Bethlehem's west coast plants, all of Bethlehem's and Youngstown's plants are located in the northeast quadrant. Each defendant ships substantial tonnages of "common finished steel products", representing substantial percentages of the total industry shipments, to this 21 state area. In 1955 Bethlehem shipped 7,854,578 tons and Youngstown shipped 2,928,655 tons rep-

resenting respectively, 14.8% and 5.5% of total industry shipments.[48] Despite freight absorption, whether by the steel producer or consumer, each is an effective and substantial competitor in that area. Because the shares of the market of each defendant do not differ materially between the nation as a whole and the northeast quadrant there is no need to treat separately the impact of the merger in the northeast quadrant. Moreover, as a practical matter the nation as a whole is more favorable to the defendants than the northeast quadrant. Their shares of industry shipments of "common finished steel products" in the former are Bethlehem, 14.4% and Youngstown, 4.9% while in the latter they are Bethlehem, 14.8% and Youngstown, 5.5%.

An economically significant area in an industry cannot be determined with the precision of a surveyor. In considering the anticompetitive consequences of a merger there is nothing sacred about the boundary lines of a state. The impact may manifest itself in an appreciable segment of a market which may coincide with a political subdivision of a state,

a state, a combination of states or the nation.

It is also appropriate to analyze the effect of the merger in the four state area of Michigan, Ohio, Pennsylvania and New York. These four contiguous states are an appreciable segment of the market. They account for 48.4% of the total industry shipments of "common finished steel products" and are where Bethlehem shipped 58.1% and Youngstown 43.3% of their "common finished steel products" in 1955.

So, too, the states of Michigan and Ohio collectively, the state of Ohio and the state of Michigan separately, are each appreciable segments of the iron and steel market and a relevant section of the country for analyzing the effect of the merger. The defendants' shares of industry shipments of common finished steel products have already been noted. The percentage of the industry's total shipments and the percentage of each defendant's total shipments made to these states readily indicate the economic significance of the areas:

| | Industry | | Bethlehem | | Youngstown | |
| | % | tons | % | tons | % | tons |
| Michigan and Ohio | 31.3 | 19,930,000 | 19.7 | 1,805,893 | 36.6 | 1,142,617 |
| Michigan | 18.2 | 11,604,000 | 14.9 | 1,369,214 | 11.5 | 360,001 |
| Ohio | 13.1 | 8,326,000 | 4.8 | 436,679 | 25.1 | 782,616 |

Indeed one of the most significant sections of the country is Michigan, with its heavy steel consuming industries, principally the automotive which takes tremendous tonnages of hot rolled sheets,

cold rolled sheets and hot rolled bars. The defendants concede that Michigan is large enough and important enough to be analyzed separately.

48. Using the defendants' mill product categories, Bethlehem and Youngstown respectively shipped 89.5% and 99.3% of their total shipments of sheets and strip to the northeast quadrant representing 14.3% and 6.1% of total industry shipments. The industry shipped 90.5% of the industry total of sheets and strips to this area.

In the case of bar mill products, Bethlehem and Youngstown respectively shipped 82.1% and 94.8% of their total shipments to the northeast quadrant representing 15.4% and 4.4% of total industry shipments. The industry shipped 88.7% of the industry total of bar mill products to the area.

In conclusion the Court finds that the appropriate relevant markets include, but are not limited to:

(1) the iron and steel industry,

(2) hot rolled sheets,

(3) cold rolled sheets, and

(4) hot rolled bars, in
 (a) the United States as a whole,
 (b) the northeast quadrant of the United States,
 (c) Michigan, Ohio, Pennsylvania and New York,
 (d) Michigan and Ohio,
 (e) Michigan and
 (f) Ohio,

(5) buttweld pipe,

(6) electricweld pipe,

(7) seamless pipe,

(8) oil field equipment,

(9) oil field equipment and supplies,

(10) tin plate, and

(11) track spikes, in
 (a) the United States as a whole.

Separate and detailed findings of fact and conclusions of law have been made with respect to these and other relevant markets. It would be a work of supererogation to consider the impact of the merger in each and every relevant market as found by the Court. A sufficient number will be discussed to indicate the basis of the Court's conclusions as to all.

## III

### Impact of the Proposed Merger on Competition

The ultimate question under section 7 is whether an acquisition may substantially lessen competition or tend to create a monopoly within the relevant market. The Government is not required to establish with certitude that competition in fact will be substantially lessened. Its burden is met if it establishes a reasonable probability that the proposed merger will substantially lessen competition or tend to create a monopoly.[49] "A requirement of certainty and actuality of injury to competition is incompatible with an effort to supplement the Sherman Act by reaching incipient restraints."[50]

There may be a substantial lessening of competition or tendency to monopoly when a merger substantially increases concentration, eliminates a substantial factor in competition, eliminates a substantial source of supply, or results in the establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete.[51] The proposed merger between Bethlehem and Youngstown would have each of these proscribed effects. The substantiality of these effects is beyond question.

49. S.Rep. No. 1775 p. 6; United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 592, 77 S.Ct. 872, 1 L.Ed.2d 1057; American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 1958, 259 F.2d 524.

50. S.Rep. No. 1775 p. 6.

51. H.R.Rep. No. 1191 p. 8. The disposition made in this case on all the evidence makes it unnecessary to consider the contentions of the two schools—"quantitative substantiality" and "qualitative substantiality". Compare United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057; Standard Oil Co. v. United States, 1949, 337 U.S. 293, 298, 314, 69 S.Ct. 1051, 93 L.Ed. 1371; H.R.Rep. No. 1417, 84th Cong., 1st Sess. 5 (1955) with Matter of Pillsbury Mills, Inc., 50 F.T.C. 555 (1953); American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 1958, 259 F.2d 524. So much has been said by opposing commentators that it has become more a battle of words than a search for the correct interpretation of § 7. In any event the clear intent of Congress must govern. The standards set out in the text are those that Congress considered appropriate in determining whether a merger would substantially lessen competition or tend to create a monopoly.

### Increase in Concentration

 A major purpose of section 7 is to ward off the anticompetitive effects of increases "in the level of economic concentration resulting from corporate mergers and acquisitions".[52] Both the Senate and House Committee Reports emphasized the deep concern of the Congress with the continued trend towards concentration of economic power through mergers and acquisitions. An immediate result of the proposed merger would be increased concentration of power in the No. 2 colossus of the steel industry by its absorption of No. 6—another giant. The merger would substantially increase concentration in the nationwide market for all the products of the iron and steel industry when viewed in terms of blast furnace capacity and production, ingot capacity and production, shipments of total finished steel products and shipments of "common finished steel products". In terms of each of these four guides the percentage of the market represented by Bethlehem is approximately 15% and that by Youngstown about 5%. The proposed merger would thus involve approximately 20% of the nationwide market for all the products of the iron and steel industry.

At present the two largest companies, United States Steel and Bethlehem own 45% of ingot capacity. If Bethlehem were to acquire Youngstown the Big 2 would have 50%. At present United States Steel with approximately 30% of the industry capacity exercises price leadership and sets the price pattern for the industry. Bethlehem, as well as all other steel producers, follows the prices set by United States Steel. Bethlehem even follows in the instance of products of which it is the largest producer. Against this pattern of price behavior in an oligopoly framework, it is apparent that an additional increase in concentration amounting to 5% would be a further detriment to competition.

Both United States Steel (with 30%) and Bethlehem (with 15%) are at present substantially larger than their competitors. Republic Steel, the third largest in the industry (with 8%), is slightly more than half the size of Bethlehem and less than one-third the size of United States Steel. The fourth, fifth, sixth, seventh and eighth companies in the industry—Jones & Laughlin, National, Youngstown, Armco and Inland—all have between 4% and 5% of the industry capacity, or about one-third that of Bethlehem and about one-sixth that of United States Steel. Increasing the concentration in United States Steel and Bethlehem would make even more remote than at present the possibility of any real competition from the smaller members of the industry who follow the leadership of United States Steel.

The significance and the substantiality of the share of ingot capacity involved in the merger is shown by the following table of the twelve largest companies in the iron and steel industry as of January 1, 1958.[53]

---

52. S.Rep. No. 1775 p. 3.

53. Except in the case of Sharon and Ford where the record only contains 1957 figures.

| Company | Rank | Share of Industry Total % | Capacity (thousands of ingot tons) |
|---|---|---|---|
| U. S. Steel | 1 | 28.6 | 40,212 |
| Bethlehem Steel | 2 | 16.3 | 23,000 |
| Republic Steel | 3 | 8.7 | 12,242 |
| Jones & Laughlin Steel | 4 | 5.3 | 7,500 |
| National Steel | 5 | 4.8 | 6,800 |
| Youngstown Sheet & Tube | 6 | 4.6 | 6,500 |
| Armco Steel | 7 | 4.5 | 6,344 |
| Inland Steel | 8 | 4.1 | 5,800 |
| Colorado Fuel & Iron | 9 | 2.0 | 2,836.5 |
| Wheeling Steel | 10 | 1.7 | 2,400 |
| Sharon Steel | 11 | 1.4 | 1,898 |
| Ford Motor | 12 | 1.4 | 1,877.4 |

In sum, the merger of Bethlehem and Youngstown would bring together the second and sixth largest integrated steel companies with 23,000,000 and 6,500,000 tons of ingot capacity, respectively, giving Bethlehem almost 21% of the industry capacity. This would add substantially to concentration in an already highly concentrated industry and reduce unduly the already limited number of integrated steel companies. The merger would increase concentration in the hands of the Big 4 and the next three companies after United States Steel by 4.6 percentage points, which would be the greatest increase in concentration in the iron and steel industry from 1901 to 1958 in the intervals of years shown below, with the exception of the decade 1920 to 1930 when Bethlehem and other large companies were engaged in a series of important mergers and acquisitions.

### % of Industry Ingot Capacity

| Year | Big 4 | | Next 3 companies after United States Steel | |
|---|---|---|---|---|
| | % of Industry | Change from Previous Period | % of Industry | Change from Previous Period |
| 1901 | 61.0 | | 13.8 | |
| 1908 | 62.8 | + 1.8 | 11.9 | — 1.9 |
| 1920 | 54.5 | — 8.3 | 14.4 | + 2.5 |
| 1930 | 67.2 | +12.7 | 26.7 | +12.3 |
| 1938 | 62.9 | — 4.3 | 27.6 | + 0.9 |
| 1945 | 62.9 | | 29.1 | + 1.5 |
| 1951 | 60.9 | — 2.0 | 28.5 | — 0.6 |
| 1957 | 58.3 | — 2.6 | 28.6 | + 0.1 |
| 1958 (before merger) | 58.9 | + 0.6 | 30.3 | + 1.7 |
| 1958 (after merger) | 63.5 | + 4.6 | 34.9 | + 4.6 |

The merger's impact on the line of commerce consisting of all the products of the iron and steel industry and on particular component lines is reflected by Bethlehem's and Youngstown's substantial percentages of the total industry shipments of the following steel products in 1955.

| | % of Industry Shipments | | |
| --- | --- | --- | --- |
| | Bethlehem | Youngstown | B–Y |
| Hot Rolled Sheets | 20.1 | 5.7 | 25.8 |
| Cold Rolled Sheets | 16.9 | 7.7 | 24.6 |
| Hot Rolled Bars | 16.9 | 4.4 | 21.3 |
| Track Spikes | 19.1 | 9.9 | 29.0 |
| Tin Mill Products [a] | 16.3 | 5.1 | 21.4 |
| Buttweld Pipe | 11.1 | 13.6 | 24.7 |
| Seamless Pipe | 4.1 | 8.0 | 12.1 |
| Electricweld Pipe [b] | 1.3 | 6.9 | 8.2 |

The increased concentration which would result from the merger cannot be considered in a vacuum; it cannot be divorced from the history of mergers and acquisitions, which in large measure accounts for the existing high degree of concentration in the industry. The substantiality of the shares of ingot capacity and shares of shipments of steel products held by Bethlehem and Youngstown take on added significance in the light of this history.

Bethlehem's growth in substantial measure is the result of mergers and acquisitions. It has held on to every increase in the share of industry ingot capacity secured as a result of merger or acquisition. Thus, Bethlehem's share of total industry capacity jumped from 6.3% in 1920 to 14.2% in 1930, following Bethlehem's acquisition of the Lackawanna and Midvale-Cambria steel companies. Subsequent to that time, Bethlehem has not only maintained its position but actually increased it to 16.3% of industry ingot capacity in 1958. To be sure, internal expansion also played a part, but the acquisition of ingot capacity by mergers and acquisitions

was most significant. In terms of production of steel ingots, Bethlehem has experienced more than a three-fold increase in tonnage since 1930, and its percentage of total industry production had risen from 13.4% to 17% as of the end of 1957.

The fact that Bethlehem has maintained the position it has achieved through mergers clearly indicates that the elimination of Youngstown's share of the market as an independent factor in competition would in all probability be permanent. The prospect of a new entrant to replace an absorbed Youngstown, either in terms of capital investment or experience, is in the light of the history of this industry, practically nihil. Since 1935 only two new integrated steel companies have been established in the iron and steel industry, Kaiser Steel Corp. and Lone Star Steel Co. Both companies entered the iron and steel industry with substantial Government assistance and together account for only 1.6% of total industry ingot capacity.[54]

The new entrants have made no real dent as far as the larger integrated companies are concerned. The ranks of the

(a) Principally tin plate.

(b) 1957 figures. Bethlehem has been producing electricweld pipe in commercial quantities only since May 1957.

54. In addition, two companies which were semi-integrated in 1935 and three companies which were nonintegrated in 1935 have since become integrated. As of January 1, 1958 these five companies together had 3.8% of industry ingot capacity.

12 largest integrated companies, which in the aggregate since 1935 have controlled about 83% of the industry ingot capacity, have remained firm. Over the 22 year period (1935–1957), no new entrant has become one of the 12 largest integrated steel companies. The same integrated steel companies have ranked among the Big 8 during the 22 year interval from 1935 to 1957, retaining 76% of the industry capacity. The Big 4 have similarly remained unaltered since 1930 and presently control 59% of the industry capacity. The evidence establishes that the industry is and will be frozen in the foreseeable future into the present number of integrated steel producers.

The absorption of Youngstown's 5% of ingot capacity by Bethlehem, the second most powerful member of the industry, giving it a total of almost 21%, approaches that share of industry capacity which, according to one of the defendants' witnesses, enables United States Steel, with 30%, to exercise "a kind of monopoly power" in an economic sense over the prices of steel products. Adding 5% to Bethlehem's 16% of industry capacity would not only intensify the existing concentration in the industry as a whole but would increase unduly the concentrated power in the Big 2 as against the reduced number of an already severely limited group. Instead of 12 producers controlling 83% of total industry capacity there would be only 11; instead of the Big 2 controlling 45% as against the present 10 with their 38%, they would control 50% as against the remaining 9 with 33%. There would be a stronger Bethlehem to contend with. There would be an even more powerful Big 2 to contend with. It is clearly the kind of further concentration in an oligopoly framework that Congress was concerned with.

"Tend to create a monopoly" clearly includes aggravation of an existing oligopoly situation.[55]

These considerations compel the conclusion that the merger offends the statute, and that in end result there is more than a reasonable probability that it would substantially lessen competition and tend to create a monopoly. But apart from the adverse consequence of increased concentration of economic power, other factors even more directly establish that there would, in fact and in immediate terms, be a substantial lessening of competition—the elimination of actual and direct competition between the two defendants.

### Lessening of Competition

As noted previously, Bethlehem and Youngstown respectively account for about 15% and 5% of the total industry shipments of all finished steel products and of "common finished steel products" on a nationwide basis. Bethlehem's acquisition of Youngstown would, of course, eliminate the actual and potential competition represented by Youngstown's share of the market. In 1955 the combined shipments of iron and steel products of Bethlehem and Youngstown amounted to $2,000,000,000. Of this $2,000,000,000, $1,500,000,000—or 75%—represented products produced and sold in common by the two companies.

With respect to certain of the component product lines, the share of the market held by Bethlehem and Youngstown is considerably greater than 20%. In certain sections of the country there is direct competition between Bethlehem and Youngstown reflected by substantial shipments of each to the same states and

55. The Senate Committee Report in setting forth the problem § 7 was intended to deal with quoted from the FTC Report on the Merger Movement: "Where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply. This latter pattern (which economists call oligopoly) is likely to be characterized by avoidance of price competition and by respect on the part of each concern for the vested interest of its rival." S.Rep. No. 1775 p. 5.

608

to the same customers. The most concentrated competition between Bethlehem and Youngstown is in Michigan, Ohio, Pennsylvania and New York, particularly in Michigan and Ohio, the first and second largest consuming states for "common finished steel products". The relative importance of each of these areas in respect to Bethlehem's and Youngstown's 1955 shipments of "common finished steel products" is shown by the following table:

| | Industry | | Bethlehem | | Youngstown | | B–Y |
| | Tons | % of U. S. Total | Tons | % of Industry Shipments | Tons | % of Industry Shipments | % of Industry Shipments |
|---|---|---|---|---|---|---|---|
| Michigan | 11,604,000 | 18.2% | 1,369,214 | 11.8% | 360,001 | 3.1% | 14.9% |
| Ohio | 8,326,000 | 13.1% | 436,679 | 5.2% | 782,616 | 9.4% | 14.6% |
| Michigan and Ohio | 19,930,000 | 31.3% | 1,805,893 | 9.1% | 1,142,617 | 5.7% | 14.8% |
| Michigan, Ohio, Pa., and N. Y. | 30,845,000 | 48.4% | 5,331,023 | 17.3% | 1,351,206 | 4.4% | 21.7% |
| Northeast Quadrant | 53,079,200 | 83.3% | 7,854,578 | 14.8% | 2,928,655 | 5.5% | 20.3% |
| United States | 63,739,000 | 100% | 9,171,396 | 14.4% | 3,121,099 | 4.9% | 19.3% |

Taken together, buttweld pipe, hot rolled sheets, cold rolled sheets, hot rolled bars and track spikes, represent 64.5% of Bethlehem's and 78.7% of Youngstown's shipments of "common finished steel products". These products

also represent 55% of Bethlehem's and 64.4% of Youngstown's shipments of all finished steel products.

*Buttweld pipe.*—Buttweld pipe accounts for 3% of total industry shipments of all steel products. In 1955 total industry shipments of buttweld pipe were 2.8 million tons, with a value of approximately $419,000,000.

Youngstown has greater capacity for the production of buttweld pipe than Bethlehem. Youngstown is the second largest buttweld pipe producer in the nation with 14.7% of industry capacity. Bethlehem is the third largest with 10.0%. Their combined capacity of 24.7% is just slightly below that of United States Steel which has 25.3% of industry capacity.

The proposed merger would result in a substantial increase in concentration in buttweld pipe. If the merger were permitted, United States Steel and Bethlehem, the then two largest companies, would have 50% of the capacity while at present the two largest companies, United States Steel and Youngstown, have 40%. This ten percentage point increase in concentration is equal to the capacity of the third and fourth companies, Republic and Wheeling, each of which has 10% of the industry capacity for buttweld pipe. The fifth largest company, National Supply, has 7% and the sixth largest, Jones & Laughlin, 5.3%. Thus, following the merger two companies, United States Steel and Bethlehem, each would have one-fourth of the industry capacity. This would place their rivals at a further competitive disadvantage.

In both 1955 and 1956 Bethlehem and Youngstown together made about 25% of the total industry shipments of buttweld pipe in the United States. Bethlehem accounted for approximately 11% and Youngstown approximately 14%. The combined shipments had a value of approximately $90,000,000 and were nationwide, going into every state of the Union. Each defendant accounts for substantial percentages of total industry shipments to many states far removed from its producing plants. In each of three years, 1953–1955, Bethlehem and Youngstown combined, accounted for one-third or more of industry shipments to each of 14 states and the District of Columbia—into some states their combined shipments were almost 60% of total industry shipments. In 7 of the nation's 10 largest consuming states, Bethlehem and Youngstown together, in 1955, accounted for more than 20% of total industry shipments of buttweld pipe.

*Hot and cold rolled sheets.*—Hot and cold rolled sheets are the first and second most important, tonnagewise, products of the iron and steel industry accounting for nearly one-third of all finished steel products. The principal consumer of these products is the automobile industry but their end uses are different. Cold rolled sheets are used for the exteriors, while hot rolled sheets are used for the frames and under-sections, of automobiles.

Bethlehem has the second largest capacity in the industry for hot rolled sheets with 14.9% and the third largest capacity for cold rolled sheets with 14.1%. Youngstown's respective capacities are 6.4% and 7.2%. Combined, Bethlehem and Youngstown have 21% of the industry capacity for hot and cold rolled sheets. In 1955 and 1956 they accounted for between 23% and 25% of the shipments of both hot and cold rolled sheets. Bethlehem's share of shipments has been consistently greater than the corresponding percentage of industry capacity. Therefore, the capacity figures understate Bethlehem's actual market position.

Capacity for hot and cold rolled sheets is more highly concentrated than the steel industry generally. In the case of hot rolled sheets the 10 largest companies control about 85% of the capacity. In the case of cold rolled sheets the 10 largest companies control 87% of the capacity. The merger would jump Bethlehem into first place, with the largest capacity of any company in the industry for both hot and cold rolled sheets. For hot rolled sheets Bethlehem would have 21.3% as against United States Steel's

20.7%, National's 9.5% and Armco's 7.-3%, with the other companies each having less than 7%. For cold rolled sheets Bethlehem would have 21.3% as against National's 15.4%, United States Steel's 14.9%, Armco's 8.8% and Republic's 8.-5%, with all the other companies having less than 7% each.

In 1955 Bethlehem and Youngstown shipped 20.1% and 5.7%, respectively, of the total industry shipments of hot rolled sheets. These shipments had a dollar value of $180,547,943 and $54,524,499.

In 1955 Bethlehem and Youngstown shipped 16.9% and 7.7%, respectively, of the total industry shipments of cold rolled sheets. These shipments had a dollar value of $295,370,524 and $133,-607,019.

In 1955 Bethlehem and Youngstown shipped hot rolled sheets to 26 of the same states and cold rolled sheets to 22 of the same states.

In the four contiguous states of Michigan, Ohio, Pennsylvania and New York, which together received about 60% of total industry shipments of hot and cold rolled sheets in 1955, Bethlehem accounted for 16.1% of total industry shipments and Youngstown 5%. In Michigan and Ohio together the defendants represent 14.8% of industry shipments (Bethlehem 8.8%; Youngstown 6%). In Michigan they represent 14.4% (Bethlehem 11.-7%; Youngstown 2.7%). In Ohio they represent 15.2% (Bethlehem 3.9%; Youngstown 11.3%).[56]

More than one-fifth of both Bethlehem's and Youngstown's sales of cold rolled sheets throughout the country in 1955 were delivered to common customers[57] in Michigan and Ohio—principally

to the leading automobile manufacturers, General Motors, Chrysler and Ford. These shipments amounted to 898,000 tons representing 5.9% of total industry shipments throughout the nation. The substantiality of these shipments is manifest when it is noted that 898,000 tons is greater than the capacity of all but 7 of the 21 companies producing cold rolled sheets in the United States and is greater than the total capacity for cold rolled sheets of such companies as Ford, Inland, Wheeling, Detroit and McLouth. Youngstown, which would be eliminated as an independent supplier to these customers, accounted for 263,000 of the 898,000 tons.

The defendants, recognizing the force of this situation, suggest that the automobile companies, giants in another giant industry, are each so powerful that they are able to fend for themselves to meet any problem posed by the elimination of Youngstown as a substantial and independent source of supply—in the language of the defendants the automobile companies with their tremendous bargaining power "have many alternative sources of supply and can easily hold such sources in line by playing one off against another". However, the automobile companies in their efforts to adjust to the merger may well deprive smaller consumers, requiring the same steel products, of their sources of supply. Moreover, the Congress in its efforts to preserve the free enterprise system and the benefits to flow to the nation and to the consuming public did not, in enacting the antitrust laws, intend to give free play to the balancing power of gigantic enterprises and leave the less powerful purchaser helpless. What the Congress

56. These percentages are based on the shipment data for sheets and strip of which grouping hot and cold rolled sheets constitute 78%. The record does not contain complete shipment data by states for hot and cold rolled sheets separately.

57. Common customers as defined by the parties include only those common customers among the 25 largest customers of each defendant on a nationwide basis.

In consequence this definition excludes other common customers who received substantial shipments in a state or group of states from each defendant but who were not among the 25 largest customers of both defendants on a national basis. So excluded are such companies as Westinghouse Electric, National Gypsum, General Fireproofing and Electric Auto Light to mention but a few. See G.Ex. 232.

sought to preserve was a social and economic order not dependent on the power of a few to take care of themselves.

*Hot rolled bars.*—Hot rolled bars are the third largest tonnage category of all steel products accounting for over 10% of the total. Bethlehem has 13.9% and Youngstown has 3.6% of total industry capacity, ranking, respectively, as the third and eighth largest. The proposed merger would result in Bethlehem having 17.5% of the industry capacity. United States Steel and Republic, ranking first and second, each have over 21% of the industry capacity for hot rolled bars with the fourth largest company having 5.7%. Thus, the acquisition of Youngstown by Bethlehem would increase the gap between the three largest companies and the smaller members of the industry.

In 1955 Bethlehem shipped 1,450,853 tons of hot rolled bars, representing 15.1%, and Youngstown shipped 384,465 tons representing 4%, of total industry shipments. Both Bethlehem and Youngstown shipped hot rolled bars to many of the same states throughout the nation.

In the four states of Michigan, Ohio, Pennsylvania and New York which together received over 50% of the total industry shipments of hot rolled bars in 1955 Bethlehem accounted for 21.2% and Youngstown 3.1%. In Michigan and Ohio together the defendants represent 16.6% of industry shipments (Bethlehem 12.6%; Youngstown 4%). In Michigan they represent 17.5% (Bethlehem 14.2%; Youngstown 3.3%). In Ohio they represent 15.1% (Bethlehem 10%; Youngstown 5.1%).[58]

*Common customers.*[59]—As already noted the three principal products of the iron and steel industry are hot rolled sheets, cold rolled sheets and hot rolled bars. Competition between Bethlehem and Youngstown in these three very important products was reflected by sales to the same customers in the same states in the same year.

Bethlehem's and Youngstown's combined 1955 shipments of these three principal products to common customers in Michigan and Ohio totaled 1,131,000 tons or about 40% of their combined shipments of 2,948,510 tons of "common finished steel products" to all their customers in these states. The 2,948,510 tons represented 14.8% of the 19,930,000 tons of total industry shipments of "common finished steel products" to the two states. Bethlehem's and Youngstown's sales of the three principal products to common customers in Michigan and Ohio represented 5.7% of total industry shipments of all "common finished steel products" to the two states. These *shipments* by the defendants of but three common products to common customers in only two states involved more tonnage than the *ingot capacity* of each of 64 of the nation's 84 companies with such capacity as of January 1, 1957.

The situation with respect to the iron and steel industry as a whole, buttweld pipe, hot rolled sheets, cold rolled sheets, and hot rolled bars demonstrates the substantiality of each defendant's competitive force in the relevant markets and the substantial anticompetitive effects which would follow in the wake of the proposed merger. But other constrictions of competition are also evident.

### Vertical Aspects of the Proposed Merger

The proposed merger is primarily horizontal. Both Bethlehem and Youngstown are engaged in the same business—producing and selling the principal products of the iron and steel industry. However, there are also significant vertical aspects of the merger. Bethlehem is integrated into a number of steel fabricating fields not occupied by Youngstown. There are small independent fabricators of steel, competitors of Bethle-

58. These percentages are based on the shipment data for bar mill products of which grouping hot rolled bars constitute 80%. See note 56 supra.

59. Common customers as defined by the parties are limited to those customers among the 25 largest customers of both companies on a national basis. See note 57 supra.

hem, who would be deprived of the availability of Youngstown as a substantial source of supply of the steel products which are the raw materials for the products they sell in competition with Bethlehem. These small independent competitors of Bethlehem would also be deprived of Youngstown as a market for various of their products which are also made by Bethlehem but not by Youngstown and which Youngstown presently purchases from them.

While the proposed merger has a vertical effect with respect to several fabricated steel products, only one, wire rope, will be treated in this opinion. The parties are agreed that the relevant geographic market for wire rope is the nation as a whole. The defendants do not contest the recognition of wire rope as a line of commerce.

Wire rope, like virtually all steel products, begins with the ingot. The next stage is the rolling of the ingot into wire rods, then the drawing of wire rods into rope wire, the immediate raw material from which wire rope is made by twisting together numerous strands of rope wire.

In February 1958 there were 24 companies producing wire rope in the United States. Of these 24 companies, five integrated steel companies (Colorado Fuel & Iron, United States Steel, Bethlehem, Jones & Laughlin and Armco), and two semi-integrated companies (American Chain & Cable and H. K. Porter Co.) accounted for 67.8% of total industry shipments of wire rope.[60] The domination of the wire rope market by steel companies having ingot capacity is the result of numerous acquisitions over a long period of time.

In the production of wire rope, Bethlehem is fully integrated from the making of steel through the stages of wire rod and rope wire, and, finally, into the production and sale of wire rope. Bethlehem consumes practically all of its own rope wire production in the manufacture of wire rope and does not sell rope wire in significant quantities to its wire rope competitors. In the sale of wire rope Bethlehem competes not only with the integrated and semi-integrated producers but also with the independent nonintegrated producers of wire rope.

Youngstown does not manufacture wire rope. It serves as a source of supply of rope wire to wire rope fabricators. It is integrated from the production of steel through the production of wire rods and rope wire. It purchases wire rope from independent fabricators for resale through its oil field supply stores. Youngstown also purchases wire rope for internal consumption from jobbers who obtain the wire rope from independent fabricators, who purchase rope wire from Youngstown.

Youngstown is an important and substantial supplier of rope wire to independent nonintegrated fabricators of wire rope. In 1955 Youngstown's shipments of rope wire represented 12.5% of total rope wire consumed by companies which manufacture wire rope but do not make rope wire. In 1956 Youngstown's shipments represented 10.9% of this total.

From a competitive standpoint the most desirable source of rope wire for a nonintegrated wire rope company is a rope wire manufacturer, such as Youngstown, which produces its own wire rods and which does not compete in the manufacture and sale of wire rope. The competitive disadvantages to the independent wire rope fabricator of purchasing rope wire from a competitor are: (1) in a period of shortage of rope wire a competitor-supplier may supply his own needs first; (2) the competitor-supplier, as a sales argument against the independent, may point to the latter's dependency upon him, the supplier, for raw materials; (3) if the independent sells wire rope below his competitor-supplier's price for wire rope he may lose his source of supply, thus giving his supplier a form of price control over him; and (4) the opportunities for a price squeeze on

60. Based on 1956 shipments figures.

the independent are enhanced, since the supplier may shift his profit between rope wire and wire rope in such a manner as to narrow or eliminate the independent's margin of profit on wire rope. As to this latter disadvantage, for several years prior to the trial and at the time of the trial the price of rope wire (the raw material) had been raised several times while the price of wire rope (the ultimate product) remained virtually constant. In effect the steel producers raised the price of the raw material sold to the independent fabricators, but did not raise the price of the ultimate product which some of the producers, including Bethlehem, sold in competition with the independents. The evidence establishes that the independents were caught in a price squeeze.

There are 23 companies in the United States producing rope wire. Only six, one of which is Youngstown, produce wire rods but do not produce and sell wire rope. Thus, were Youngstown to be acquired by Bethlehem there would be removed from the market one of the only six companies in the United States which are the most desirable noncompetitive sources of supply of rope wire for the nonintegrated independent wire rope fabricators. In view of the price squeeze and other competitive disadvantages under which the independent wire rope fabricators labor, to remove Youngstown as a source of supply would render even more hazardous the competitive position of the independents and might well mean the difference between their continued existence and their extinction.

As to the other facet of the vertical effect of the proposed merger, since Bethlehem is a producer of wire rope, the reasonable probability is that Bethlehem would supply its own requirements so that Youngstown would no longer be a market for the independent fabricators. This foreclosure of Youngstown as a market for wire rope would involve about 1.3% of the entire market or 2,-

585 tons and 2,815 tons of total industry sales of 203,000 tons and 224,000 tons in 1955 and 1956, respectively.

In the case of wire rope what is involved is not only the elimination of Youngstown—a noncompetitor—as a substantial source of supply to independent fabricators but the substitution of Bethlehem—a competitor of the independents—as their source of supply, unless alternative suppliers are available. Further, there is the loss to the independent fabricators, who purchase rope wire from Youngstown, of Youngstown as a substantial customer. In some cases Youngstown purchases about 10% of the independent fabricator's total output and in one case this amounts to about $1,000,000 a year.

The impact would be in terms of a significant restriction of access to a vital source of supply and also to a needed market. Thus, the merger presents a double edged threat to the independent wire rope fabricators. Here it may be emphasized that one of the factors which led to the passage of amended section 7 was the threat to small business by the merger movement. The proposed merger poses just that threat.

The vertical effects of the merger not only establish a violation of section 7 with respect to wire rope [61] but the sum total of the vertical effects, in wire rope and certain other steel products, like concrete reinforcement bars and industrial fasteners where small nonintegrated fabricators are still significant factors in the market, illustrates the impact of the merger in the iron and steel industry as a whole.

Oil Field Equipment and Supplies

In the instance of oil field equipment and the sale of oil field supplies the competitive activities of Bethlehem and Youngstown are of a two fold nature.

First, each defendant manufactures and sells the component parts of the ro-

---

**61.** United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057.

tary system for drilling oil wells, the principal method used in the United States, and also the essential items for the extraction of oil. The various parts of the oil well drilling and production equipment are: drawworks, rotaries, traveling blocks, swivels, slush pumps, pumping units and sucker rods. The defendants compete with each other in the production and sale of these items on a nationwide basis. In 1956 Bethlehem and Youngstown were respectively, the nation's sixth and third largest oil field equipment producers. In 1956 Bethlehem's and Youngstown's shipments of drawworks, rotaries, traveling blocks, swivels, slush pumps and pumping units amounted to $9,434,048 and $13,216,633, respectively, representing 6.2% and 8.7% of total industry shipments.

Second, each defendant maintains and operates supply stores throughout the oil producing regions of the nation, from which they sell not only the drilling equipment and pumping units manufactured by themselves, but other oil field supplies which they purchase from other manufacturers. In effect they may be considered as retailers of the entire range of oil field equipment and supplies. Bethlehem has 65 supply stores in 14 states and Youngstown has 83 such stores in 16 states. Both companies have 42 stores in the very same cities or towns.

The defendants purchase very substantial quantities of supplies from other manufacturers for sale through their stores. Two-thirds of the products sold by Bethlehem ($56.6 million out of $83.8 million) and over half the products sold by Youngstown ($51.5 million out of $99.1 million) in 1956 through their oil field supply stores were produced by other companies.

Total industry sales of oil field equipment and supplies in 1956 were $1,481,000,000. Bethlehem's supply stores accounted for 5.7% and Youngstown's for 6.7% of total industry sales. The supply stores of Bethlehem and Youngstown accounted for the following percentages of total industry sales of oil field supply stores in 1956 of major oil field equipment and supply items:

| | Industry Sales (thous.) | % of Industry Sales | | B–Y Combined |
|---|---|---|---|---|
| | | Bethle-hem | Youngs-town | |
| Drawworks | $ 28,432 | 2.8 | 5.0 | 7.8 |
| Rotaries | 3,701 | 3.6 | 10.4 | 14.0 |
| Traveling blocks | 3,579 | 3.8 | 6.1 | 9.9 |
| Swivels | 2,073 | 4.1 | 7.4 | 11.5 |
| Slush pumps | 15,193 | 5.8 | 8.6 | 14.4 |
| Pumping units | 69,436 | 7.4 | 3.7 | 11.1 |
| Wire rope | 18,000 | 7.0 | 6.3 | 13.3 |
| Sucker rods | 48,000 | 5.8 | 9.2 | 15.0 |
| Rock bits | 103,000 | 8.9 | 12.6 | 21.5 |
| Steel tubular products | 568,000 | 5.2 | 5.6 | 10.8 |
| All other products | 621,586 | 5.5 | 6.9 | 12.4 |

For drawworks, rotaries, traveling blocks, swivels, pumping units and sucker rods, both companies produce all or virtually all their requirements. Bethlehem makes its own requirements for slush pumps and wire rope but Youngstown purchases nearly all its requirements for those products. Seamless pipe, the principal item in the steel tubular products category, is produced by Youngstown but not by Bethlehem. Both companies purchase all their re-

quirements for rock bits, and four-fifths of their requirements for the category "all other products".

Thus the proposed merger would have both horizontal and vertical impact with respect to oil field equipment and supplies. As to the sale of all these products and the production of some, the impact would be horizontal. To the extent that Youngstown purchases some of these products from others and to the extent that Bethlehem produces some of these products, like wire rope and slush pumps, not produced by Youngstown, there would be a foreclosure of substantial outlets for the companies which have been supplying Youngstown's requirements.

The proposed merger would (1) eliminate the substantial competition between Bethlehem and Youngstown in the production and sale of oil field equipment and supplies;[62] (2) result in the foreclosure of a substantial portion of the market for oil field equipment and supplies produced by other companies; and (3) result in a substantial increase in concentration in the oil field equipment industry in the hands of the integrated steel companies since Bethlehem, Youngstown, United States Steel and Armco account for about 47% of the total industry shipments of oil field equipment; thereafter three instead of four integrated companies would control this percentage.

## IV

### Conclusion

To sum up the Court's conclusions as to the impact of the merger, it is clear that the acquisition of Youngstown, by Bethlehem, would violate section 7 in that in each of the relevant markets considered the effect may be substantially to lessen competition or to tend to create a monopoly.

The proposed merger would eliminate the present substantial competition between Bethlehem and Youngstown in substantial relevant markets. It would eliminate substantial potential competition between them. It would eliminate a substantial independent alternative source of supply for all steel consumers. It would eliminate Youngstown as a vital source of supply for independent fabricators who are in competition with Bethlehem in the sale of certain fabricated steel products. It would eliminate Youngstown as a substantial buyer of certain fabricated steel products.

One final matter remains to be considered. The defendants urge earnestly that in considering the impact on competition of the proposed merger the Court take into account what they point to as its beneficial aspects. Any lessening of competition resulting from the merger should be balanced, they say, against the benefits which would accrue from Bethlehem's plan to expand the Youngstown plants thus creating new steel capacity in an existing deficit area and enhancing the power of the merged company to give United States Steel more effective and vigorous competition than Bethlehem and Youngstown can now give separately.

We pass for the moment the question of whether or not this contention is anything more than an expression of good intention and high purpose.[63]

62. Cf. United States v. Sears, Roebuck & Co., D.C.S.D.N.Y.1953, 111 F.Supp. 614.

63. In which event it is irrelevant. United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057; Standard Oil Co. v. United States, 1949, 337 U.S. 293, 298–299, 69 S.Ct. 1051, 93 L.Ed. 1371. See also H.R.Rep. No. 1191, p. 8. "Under [§ 7] a merger or acquisition will be unlawful if it may have the effect of either (a) substantially lessening competition or (b) tending to create a monopoly. These two tests of illegality are intended to be similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act. *Thus it would be unnecessary for the Government to speculate as to what is in the 'back of the minds' of those who promote a merger;* or to prove that the acquiring firm had engaged in actions which are considered to be unethical or predatory; or to show that as a result of a merger the ac-

The substance of their argument is: the steel mills in and around the Chicago area [64] lack sufficient plant capacity to satisfy demand in that area, especially for heavy structural shapes and plates; these have been in critical short supply for years and the lag has been supplied by distant steel producers at excessive freight costs and premium prices. The defendants contend that the situation will become more acute in the years ahead and that the shortage has already resulted in new steel consuming industries locating their plants in other regions of the country—a "kind of chain reaction [which] is a wasteful drag on the country's economic resources". The defendants say a remedy is sorely needed "and that the merger will unquestionably provide that remedy". In essence this summarizes their justification for the merger.

What is planned under the proposed merger is an expansion of the ingot capacity of Youngstown's two existing plants, one at Chicago and the other at Youngstown, by 2,588,000 tons, and a new plate mill and a new structural shape mill at Youngstown's Chicago plant with combined capacity of 1,176,000 tons. The plan also provides for a modernization program which would increase capacity to roll certain products at the Chicago and Youngstown plants. This part of the plan is unrelated to the structural shape and plate program.

It is undoubtedly easier and cheaper to acquire and develop existing plant capacity than to build entirely anew. Each defendant in urging the merger takes a dim view of its ability to undertake, on its own, a program to meet the existing and anticipated demand for heavy structural shapes and plates in the Chicago area. Youngstown claims it is without the know-how, the experienced personnel, or the requisite capital to enter into the structural shape and plate business.

Bethlehem, acknowledging it has the know-how and the experience in that field, contends that the construction of an entirely new fully integrated plant in the Chicago area of 2,500,000 tons of ingot capacity is not economically feasible. It estimates that such a new plant would cost $750,000,000 (or $300 per ton of ingot capacity) as compared to $358,-000,000 (or $135 per ton ingot capacity) for expansion of Youngstown's existing plants under the plan outlined above. Bethlehem also rules out as uneconomical the construction of a new plant in the Chicago area limited to structural shape and plate mills.

The defendants' apprehensions, which, of course, involve matters of business judgment and, in a sense, matters of preference, are not persuasive in the light of their prior activities and history, their financial resources, their growth and demonstrated capacity through the years to meet the challenge of a constantly growing economy.

Over the decades Bethlehem has grown through mergers and acquisitions; it has grown internally; it has not only maintained but bettered its position in a highly concentrated industry; it has never lacked the financial resources or the effective means required to expand and keep pace with the increased demands of our national economy.

From an ingot capacity of 212,800 tons in 1905 Bethlehem's capacity reached 23,-000,000 by January 1, 1958. During the nine year period from January 1, 1948 to January 1, 1957, it expanded its ingot capacity from 13,800,000 tons to 20,500,000 tons, an increase of 6,700,000 tons or 48.6%. Over the five year period from 1953 to 1958 the percentage increase was 30.7%. The fact is that within one year of the commencement of this action to enjoin the merger, Bethlehem increased its steel capacity by 2,-500,000 tons. The significance of this

quiring firm had already obtained such a degree of control that it possessed the power to destroy or exclude competitors or fix prices." (Emphasis supplied.)

64. As referred to by the defendants the Chicago area consists of the states of Indiana, Illinois, Wisconsin, Minnesota, Iowa, Missouri, North Dakota, South Dakota, Nebraska, and Kansas.

increase is apparent when it is noted that as of January 1, 1957 there were in the United States 84 companies with steel ingot capacity, of which 75 had a total capacity of less than 2,500,000 tons.

Youngstown no less than Bethlehem has demonstrated ability to keep pace with the demands of our growing economy. Youngstown expanded from an ingot capacity of 806,400 tons in 1906 to 6,500,000 tons by January 1, 1958. During the nine year period from January 1, 1948 to January 1, 1957 it expanded its ingot capacity from 4,002,000 tons to 6,240,000—an increase of 2,238,000 or 55.9%. Over the five year period from 1953 to 1958 its ingot capacity grew 31.4%.

Youngstown, too, has been a vigorous factor in the steel industry. Its position as No. 6 casts it in the role of one of the giants of that mammoth industry. Through the years it has carried on a regular expansion program. In 1955, without regard to the merger, it projected a comprehensive future development plan, part of which has already been put into effect. During the 10 year period, 1947–1956, Youngstown made capital expenditures of $353,000,000.

A fact not to be overlooked—indeed one to be underscored—is that no adverse factor justifies Youngstown's participation in the proposed merger. Indeed for a number of years the return on its invested capital was greater than that earned by either United States Steel or Bethlehem. No financial stringency, present or threatened, justifies its absorption by Bethlehem.

The Court is not persuaded that the proposed merger is the only way in which the supply of plates and shapes in the Chicago area can be expanded. Other steel producers are capable of meeting the challenge. In fact both United States Steel and Inland are in the process of expanding their capacities in the Chicago area for structural shapes and United States Steel is also expanding its capacity for plates in that area.

In essence, the defendants are maintaining that a proposed capacity increase of 1,176,000 tons in the Chicago area for plates and structural shapes counterbalances a merger between companies which produced over 24,000,000 tons of ingots and shipped almost 15,500,000 tons of a great variety of finished steel products in 1955. It has already been noted that hot rolled sheets, cold rolled sheets and hot rolled bars are the three most important products of the iron and steel industry and that Bethlehem and Youngstown are substantial and important factors in the production of these key products. Plates and structural shapes are substantially less important in terms of tonnage than hot and cold rolled sheets and hot rolled bars. Assuming the relevance of the argument, the defendants have failed to establish counterbalancing benefits to offset the substantial lessening of competition which would result from the merger.

Not only do the facts fail to support the defendants' contention, but the argument does not hold up as a matter of law. If the merger offends the statute in any relevant market then good motives and even demonstrable benefits are irrelevant and afford no defense. Section 7 "is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended".[65]

The antitrust laws articulate the policy formulated by Congress. The significance and objectives of the Clayton Act and the 1950 amendment are well documented. In approving the policy embodied in these acts, Congress rejected the alleged advantages of size in favor of the preservation of a competitive system. The consideration to be accorded to benefits of one kind or another in one section or another of the country which may flow from a merger involving a substantial lessening of competition is a matter

---

65. United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057.

properly to be urged upon Congress. It is outside the province of the Court. The simple test under section 7 is whether or not the merger may substantially lessen competition "in any line of commerce in any section of the country".

Any alleged benefit to the steel consumer in the Chicago district because of reduced freight charges and an increased supply, cannot, under the law, be bought at the expense of other consumers of numerous other steel products where the effects of the merger violate the Act. A merger may have a different impact in different markets—but if the proscribed effect is visited on one or more relevant markets then it matters not what the claimed benefits may be elsewhere. And for that matter, with respect to oil field equipment and supplies, as separate lines of commerce, the contention itself is by its own terms unavailing.[66] Amended section 7 as stated in the Committee Reports " * * * is intended [to prohibit] acquisitions which substantially lessen competition, as well as those which tend to create a monopoly * * * if they have the specified effect in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition. * * * [67] The purpose of the bill is to protect competition in *each* line of commerce in *each* section of the country".[68] (Emphasis supplied)

The merger offers an incipient threat of setting into motion a chain reaction of further mergers by the other but less powerful companies in the steel industry. If there is logic to the defendants' contention that their joinder is justified to enable them, in their own language, to offer "challenging competition to United States Steel * * * which exercises dominant influence over competitive conditions in the steel industry * * *" then the remaining large producers in the "Big 12" could with equal logic urge that they, too, be permitted to join forces and to concentrate their economic resources in order to give more effective competition to the enhanced "Big 2"; and so we reach a point of more intense concentration in an industry already highly concentrated—indeed we head in the direction of triopoly.

Congress in seeking to halt the growing tendency to increased concentration of power in various industries was fully aware of the arguments in support of the supposed advantages of size and the claim of greater efficiency and lower cost to the ultimate consumer. It made no distinction between good mergers and bad mergers. It condemned all which came within the reach of the prohibition of section 7. The function of the Court is to carry out declared Congressional policy. "Though our preference were for monopoly and against competition, we should 'guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy' ".[69] The Court must take the statute as written.

The proposed merger runs afoul of the prohibition of the statute in so many directions that to permit it, is to render section 7 sterile. To say that the elimination of Youngstown would not result in "a significant reduction in the vigor of competition" in the steel industry is, in the light of its history, to disregard experience.

■ The Court concludes that there is a reasonable probability that the merger of Bethlehem and Youngstown would, in violation of section 7, substantially lessen competition and tend to create a monopoly in:

(1) the iron and steel industry,

(2) hot rolled sheets,

(3) cold rolled sheets and

---

66. See note 38 supra.

67. S.Rep. No. 1775 p. 5.

68. H.R.Rep. No. 1191 p. 8.

69. Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 1958, 356 U.S. 282, 289, 78 S.Ct. 738, 743, 2 L.Ed.2d 771.

(4) hot rolled bars, in
- (a) the United States as a whole,
- (b) the northeast quadrant of the United States,
- (c) Michigan, Ohio, Pennsylvania and New York,
- (d) Michigan and Ohio,
- (e) Michigan, and
- (f) Ohio,

(5) buttweld pipe,

(6) electricweld pipe,

(7) seamless pipe,

(8) oil field equipment,

(9) oil field equipment and supplies,

(10) tin plate,

(11) track spikes, and

(12) wire rope, in
- (a) the United States as a whole.

Submit decree within ten days, in accordance with the foregoing and the further enumerated findings of fact and conclusions of law filed herewith, enjoining the proposed merger as violative of section 7 of the Clayton Act.